492 S.E.2d 777

**Cornelia WHITNER, Respondent,**

**v.**

**STATE of South Carolina, Petitioner.**

**No. 24468.**

Supreme Court of South Carolina.

Heard May 31, 1995.

Filed July 15, 1996.

Amended and Refiled on Grant of Rehearing Oct. 27, 1997.

Rehearing Denied Nov. 19, 1997.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Attorney General Teresa Nesbitt Cosby, Staff Attorney David K. Avant, Columbia, for Petitioner.

C. Rauch Wise, of Wise & Tunstall, Greenwood; Lynn M. Paltrow and Lisa S. Tankoos, both of The Center for Reproductive Law & Policy, New York, for Respondent.

Stephen P. Williams, Columbia, for Amici Curiae South Carolina Medical Association; American Medical Association & American College of Obstetricians & Gynecologists.

Robert H. Hood and Joseph C. Wilson, IV, both of Hood Law Firm, Charleston, for Amici Curiae City of Charleston, South Carolina; Board of Trustees and various employees of the MUSC; Reuben Greenberg, Chief of Charleston Police Department; Charles Molony Condon, former Ninth Circuit Solicitor; and David Schwacke, current Ninth Circuit Solicitor.

Susan Dunn, Charleston; Carol E. Tracy and Susan Frietsche, Philadelphia, PA, for Amici Curiae The American Public Health Association; American Medical Women's Association; American Nurses Association; Coalition on Addiction, Pregnancy and Parenting; Drug Policy Foundation; National Council on Alcoholism and Drug Dependence; National Perinatal Association; Planned Parenthood of Central South Carolina; National Women's Health Network; NOW Legal Defense and Education Fund; South Carolina Chapter of The National Organization for Women; South Carolina Nurses Association; and The Women's Law Project and Operation PAR.

John D. (Jay) Elliott, Columbia, for Amicus Curiae The Alliance for South Carolina's Children.

TOAL, Justice.

This case concerns the scope of the child abuse and endangerment statute in the South Carolina Children's Code (the Code), S.C.Code Ann. § 20–7–50 (1985).[1] We hold the word "child" as used in that statute includes viable fetuses.

## FACTS

On April 20, 1992, Cornelia Whitner (Whitner) pled guilty to criminal child neglect, S.C.Code Ann. § 20–7–50 (1985), for causing her baby to be born with cocaine metabolites in its system by reason of Whitner's ingestion of crack cocaine during the third trimester of her pregnancy. The circuit court judge sentenced Whitner to eight years in prison. Whitner did not appeal her conviction.

Thereafter, Whitner filed a petition for Post Conviction Relief (PCR), pleading the circuit court's lack of subject matter jurisdiction to accept her guilty plea as well as ineffec-

---

1. Section 20–7–50 was amended in 1993 to make violation of the section a felony and to make the maximum term of imprisonment conform to the new crime classification system. *See* S.C.Code Ann. § 20–7–50 (Supp.1994). We cite the earlier version of the statute in this opinion because Whitner was prosecuted under that version. The language in the amended section relating to the actions constituting the crime is identical to the language under which Whitner was prosecuted. In other words, although the characterization of and penalty for the crime have changed, the acts constituting the crime have not.

tive assistance of counsel. Her claim of ineffective assistance of counsel was based upon her lawyer's failure to advise her the statute under which she was being prosecuted might not apply to prenatal drug use. The petition was granted on both grounds. The State appeals.

## LAW/ANALYSIS

### A. Subject Matter Jurisdiction

The State first argues the PCR court erred in finding the sentencing circuit court lacked subject matter jurisdiction to accept Whitner's guilty plea. ·We agree.

 Under South Carolina law, a circuit court lacks subject matter jurisdiction to accept a guilty plea to a nonexistent offense. *See Williams v. State*, 306 S.C. 89, 410 S.E.2d 563 (1991). For the sentencing court to have had subject matter jurisdiction to accept Whitner's plea, criminal child neglect under section 20–7–50 would have to include an expectant mother's use of crack cocaine after the fetus is viable.[2] All other issues are ancillary to this jurisdictional issue.

S.C.Code Ann. § 20–7–50 (1985) provides:

Any person having the legal custody of any *child* or helpless person, who shall, without lawful excuse, refuse or neglect to provide, as defined in § 20–7–490, the proper care and attention for such *child* or helpless person, so that the life, health or comfort of such *child* or helpless person is endangered or is likely to be endangered, shall be guilty of a misdemeanor and shall be punished within the discretion of the circuit court. (emphasis added).

---

2. The State argues we need not reach the issue of the applicability of section 20–7–50 to viable fetuses, because the indictment alleged a violation on the date of the child's birth. We disagree. The basis for the indictment was the presence of cocaine in the newborn infant. Unless Whitner gave her child cocaine after the child's birth, which no one has alleged, the behavior giving rise to the abuse and neglect charge necessarily occurred before the child was born. Moreover, the record of Whitner's original hearing and the hearing on her petition for Post Conviction Relief make clear the conviction was for her neglecting her child by ingesting crack cocaine during pregnancy. For that reason, we must determine whether section 20–7–50 applies to such behavior.

The State contends this section encompasses maternal acts endangering or likely to endanger the life, comfort, or health of a *viable fetus.*

Under the Children's Code, "child" means a "person under the age of eighteen." S.C.Code Ann. § 20–7–30(1) (1985). The question for this Court, therefore, is whether a viable fetus is a "person" for purposes of the Children's Code.

In interpreting a statute, this Court's primary function is to ascertain the intent of the legislature. *E.g., State v. Ramsey,* 311 S.C. 555, 430 S.E.2d 511 (1993). Of course, where a statute is complete, plain, and unambiguous, legislative intent must be determined from the language of the statute itself. *E.g., State v. Blackmon,* 304 S.C. 270, 403 S.E.2d 660 (1991). We should consider, however, not merely the language of the particular clause being construed, but the word and its meaning in conjunction with the purpose of the whole statute and the policy of the law. *E.g., South Carolina Coastal Council v. South Carolina State Ethics Comm'n,* 306 S.C. 41, 410 S.E.2d 245 (1991). Finally, there is a basic presumption that the legislature has knowledge of previous legislation as well as of judicial decisions construing that legislation when later statutes are enacted concerning related subjects. *See Berkebile v. Outen,* 311 S.C. 50, 426 S.E.2d 760 (1993); 82 C.J.S. *Statutes* § 316, at 541–42 (1953).

South Carolina law has long recognized that viable fetuses are persons holding certain legal rights and privileges. In 1960, this Court decided *Hall v. Murphy,* 236 S.C. 257, 113 S.E.2d 790 (1960). That case concerned the application of South Carolina's wrongful death statute to an infant who died four hours after her birth as a result of injuries sustained prenatally during viability. The Appellants argued that a viable fetus was not a person within the purview of the wrongful death statute, because, *inter alia,* a fetus is thought to have no separate being apart from the mother.

We found such a reason for exclusion from recovery "unsound, illogical and unjust," and concluded there was "no medical or other basis" for the "assumed identity" of mother and viable unborn child. *Id.* at 262, 113 S.E.2d at 793. In light of that conclusion, this Court unanimously held: "We have no difficulty in concluding that a fetus having reached

that period of prenatal maturity where it is capable of independent life apart from its mother *is a person.*" *Id.* at 263, 113 S.E.2d at 793 (emphasis added).

Four years later, in *Fowler v. Woodward,* 244 S.C. 608, 138 S.E.2d 42 (1964), we interpreted *Hall* as supporting a finding that a viable fetus injured while still in the womb need not be born alive for another to maintain an action for the wrongful death of the fetus.

> Since a viable child is a *person before separation from the body of its mother* and since prenatal injuries tortiously inflicted on such a child are actionable, it is apparent that the complaint alleges such an 'act, neglect or default' by the defendant, to the injury of the child. . . .
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> *Once the concept of the unborn, viable child as a person* is accepted, we have no difficulty in holding that a cause of action for tortious injury to such a child arises immediately upon the infliction of the injury.

*Id.* at 613, 138 S.E.2d at 44 (emphasis added). *Fowler* makes particularly clear that *Hall* rested on the concept of the viable fetus as a person vested with legal rights.

More recently, we held the word "person" as used in a *criminal* statute includes viable fetuses. *State v. Horne,* 282 S.C. 444, 319 S.E.2d 703 (1984), concerned South Carolina's murder statute, S.C.Code Ann. § 16–3–10 (1976). The defendant in that case stabbed his wife, who was nine months' pregnant, in the neck, arms, and abdomen. Although doctors performed an emergency caesarean section to deliver the child, the child died while still in the womb. The defendant was convicted of voluntary manslaughter and appealed his conviction on the ground South Carolina did not recognize the crime of feticide.

This Court disagreed. In a unanimous decision, we held it would be "grossly inconsistent . . . to construe a viable fetus as a 'person' for the purposes of imposing civil liability while refusing to give it a similar classification in the criminal context." *Id.* at 447, 319 S.E.2d at 704 (citing *Fowler v. Woodward, supra* ). Accordingly, the Court recognized the crime of feticide with respect to viable fetuses.

Similarly, we do not see any rational basis for finding a viable fetus is not a "person" in the present context. Indeed, it would be absurd to recognize the viable fetus as a person for purposes of homicide laws and wrongful death statutes but not for purposes of statutes proscribing child abuse. Our holding in *Hall* that a viable fetus is a person rested primarily on the plain meaning of the word "person" in light of existing medical knowledge concerning fetal development. We do not believe that the plain and ordinary meaning of the word "person" has changed in any way that would now deny viable fetuses status as persons.

The policies enunciated in the Children's Code also support our plain meaning reading of "person." S.C.Code Ann. § 20–7–20(C) (1985), which describes South Carolina's policy concerning children, expressly states: "It shall be the policy of this State to concentrate on the *prevention of children's problems* as the most important strategy which can be planned and implemented on behalf of children and their families." (emphasis added). The abuse or neglect of a child at *any* time during childhood can exact a profound toll on the child herself as well as on society as a whole. However, the consequences of abuse or neglect which takes place after birth often pale in comparison to those resulting from abuse suffered by the viable fetus before birth. This policy of prevention supports a reading of the word "person" to include viable fetuses. Furthermore, the scope of the Children's Code is quite broad. It applies "to *all* children who have need of services." S.C.Code Ann. § 20–7–20(B) (1985) (emphasis added). When coupled with the comprehensive remedial purposes of the Code, this language supports the inference that the legislature intended to include viable fetuses within the scope of the Code's protection.

Whitner advances several arguments against an interpretation of "person" as used in the Children's Code to include viable fetuses. We shall address each of Whitner's major arguments in turn.

Whitner's first argument concerns the number of bills introduced in the South Carolina General Assembly in the past five years addressing substance abuse by pregnant women. Some of these bills would have criminalized substance abuse by

pregnant women;[3] others would have addressed the issue through mandatory reporting, treatment, or intervention by social service agencies.[4] Whitner suggests that the introduction of several bills touching the specific issue at hand evinces a belief by legislators that prior legislation had not addressed the issue. Whitner argues the introduction of the bills proves that section 20–7–50 was not intended to encompass abuse or neglect of a viable fetus.

■ We disagree with Whitner's conclusion about the significance of the proposed legislation. Generally, the legislature's subsequent acts "cast no light on the intent of the legislature which enacted the statute being construed." *Home Health Servs., Inc. v. DHEC*, 298 S.C. 258, 262 n. 1, 379 S.E.2d 734, 736 n. 1 (Ct.App.1989) (citations omitted). Rather, this Court will look first to the *language* of the statute to discern legislative intent, because the language itself is the best guide to legislative intent. *E.g., State v. Blackmon*, 304 S.C. 270, 403 S.E.2d 660 (1991). Here, we see no reason to look beyond the statutory language. *See Timmons v. South Carolina Tricentennial Comm'n, supra* (where statute's meaning can be determined from its language, no need to look beyond such language). Additionally, our existing case law strongly sup-

---

3. *See, e.g.,* S. 4032 (1993) (proposing making it a crime for a pregnant woman to ingest a controlled substance); H. 4486 (1994) (proposing amendment to section 20–7–50 to apply to actions of pregnant women).

4. *See* S. 1495 (1989–1990), reintroduced as S. 75 (1990–1991) (requiring drug testing of newborns and to include within civil definition of neglect any newborn testing positive for controlled substance); S. 1470 (1989–1990), reintroduced as S. 79 (1991) (mandating reporting to DSS pregnant woman believed to have used controlled substance; providing for education and drug treatment); H. 3858 (1990–1991) (requiring reporting of pregnant woman believed to be using controlled substance and expanding civil definition of "abused child" to include newborn testing positive for illegal drugs); S. 986 (1991) (mandating drug testing on newborn infants, requiring reporting such infants as abused under civil abuse laws, and requiring reversible sterilization or implantation of birth control until mother completes drug treatment program); S. 155 (1992–1994) (permitting testing newborns for controlled substances and reporting such test results to DSS for limited purposes); S. 1256 (1992), reintroduced as S. 150 (1992–1993) (permitting referral to DHEC of families with children prenatally exposed to drugs and giving pregnant women priority in drug treatment programs).

ports our conclusion about the meaning of the statute's language.

Whitner also argues an interpretation of the statute that includes viable fetuses would lead to absurd results obviously not intended by the legislature. Specifically, she claims if we interpret "child" to include viable fetuses, *every* action by a pregnant woman that endangers or is likely to endanger a fetus, whether otherwise legal or illegal, would constitute unlawful neglect under the statute. For example, a woman might be prosecuted under section 20–7–50 for smoking or drinking during pregnancy. Whitner asserts these "absurd" results could not have been intended by the legislature and, therefore, the statute should not be construed to include viable fetuses.

We disagree for a number of reasons. First, the same arguments against the statute can be made whether or not the child has been born. After the birth of a child, a parent can be prosecuted under section 20–7–50 for an action that is likely to endanger the child without regard to whether the action is illegal in itself. For example, a parent who drinks excessively could, under certain circumstances, be guilty of child neglect or endangerment even though the underlying act—consuming alcoholic beverages—is itself legal. Obviously, the legislature did not think it "absurd" to allow prosecution of parents for such otherwise legal acts when the acts actually or potentially endanger the "life, health or comfort" of the parents' born children. We see no reason such a result should be rendered absurd by the mere fact the child at issue is a viable fetus.

Moreover, we need not address this potential parade of horribles advanced by Whitner. In *this* case, which is the only case we are called upon to decide here, certain facts are clear. Whitner admits to having ingested crack cocaine during the third trimester of her pregnancy, which caused her child to be born with cocaine in its system. Although the precise effects of maternal crack use during pregnancy are somewhat unclear, it is well documented and within the realm of public knowledge that such use can cause serious harm to the viable unborn child. *See, e.g.,* Joseph J. Volpe, M.D., *Effect of Cocaine Use on the Fetus,* 327 NEW ENG.J.MED. 399

(1992); Ira J. Chasnoff, M.D., et al., *Cocaine Use in Pregnancy,* 313 NEW ENG.J.MED. 666 (1985). There can be no question here Whitner endangered the life, health, and comfort of her child. We need not decide any cases other than the one before us.

We are well aware of the many decisions from other states' courts throughout the country holding maternal conduct before the birth of the child does not give rise to criminal prosecution under state child abuse/endangerment or drug distribution statutes. *See, e.g., Johnson v. State,* 602 So.2d 1288 (Fla.1992); *Commonwealth v. Welch,* 864 S.W.2d 280 (Ky.1993); *State v. Gray,* 62 Ohio St.3d 514, 584 N.E.2d 710 (1992); *Reyes v. Superior Court,* 75 Cal.App.3d 214, 141 Cal.Rptr. 912 (1977); *State v. Carter,* 602 So.2d 995 (Fla.Ct. App.1992); *State v. Gethers,* 585 So.2d 1140 (Fla.Ct.App.1991); *State v. Luster,* 204 Ga.App. 156, 419 S.E.2d 32 (1992), *cert. denied* (Ga.1992); *Commonwealth v. Pellegrini,* No. 87970, slip op. (Mass.Super.Ct. Oct. 15, 1990); *People v. Hardy,* 188 Mich.App. 305, 469 N.W.2d 50, *app. denied,* 437 Mich. 1046, 471 N.W.2d 619 (1991); *Commonwealth v. Kemp,* 434 Pa.Super. 719, 643 A.2d 705 (1994). Many of these cases were prosecuted under statutes forbidding delivery or distribution of illicit substances and depended on statutory construction of the terms "delivery" and "distribution." *See, e.g., Johnson v. State, supra; State v. Luster, supra; People v. Hardy, supra.* Obviously, such cases are inapplicable to the present situation. The cases concerning child endangerment statutes or construing the terms "child" and "person" are also distinguishable, because the states in which these cases were decided have entirely different bodies of case law from South Carolina. For example, in *Commonwealth v. Welch,* the Kentucky Supreme Court specifically noted Kentucky law has not construed the word "person" in the criminal homicide statute to include a fetus (viable or not). *Welch,* 864 S.W.2d at 281. In *Reyes v. Superior Court,* the California Court of Appeals noted California law did not recognize a fetus as a "human being" within the purview of the state murder and manslaughter statutes, and that it was thus improper to find the fetus was a "child" for purposes of the felonious child endangerment statute. *Reyes,* 75 Cal.App.3d at 217, 141 Cal.Rptr. 912.

Massachusetts, however, has a body of case law substantially similar to South Carolina's, yet a Massachusetts trial court has held that a mother pregnant with a viable fetus is not criminally liable for transmission of cocaine to the fetus. *See Commonwealth v. Pellegrini*, No. 87970, slip op. (Mass.Super.Ct. Oct. 15, 1990).[5] Specifically, Massachusetts law allows wrongful death actions on behalf of viable fetuses injured *in utero* who are not subsequently born alive. *Mone v. Greyhound Lines, Inc.*, 368 Mass. 354, 331 N.E.2d 916 (1975). Similarly, Massachusetts law permits homicide prosecutions of third parties who kill viable fetuses. *See Commonwealth v. Cass*, 392 Mass. 799, 467 N.E.2d 1324 (1984) (ruling a viable fetus is a person for purposes of vehicular homicide statute); *Commonwealth v. Lawrence*, 404 Mass. 378, 536 N.E.2d 571 (1989) (viable fetus is a person for purposes of common law crime of murder). Because of the similarity of the case law in Massachusetts to ours, the *Pellegrini* decision merits examination.

In *Pellegrini*, the Massachusetts Superior Court found that state's distribution statute does not apply to the distribution of an illegal substance to a viable fetus. The statute at issue forbade distribution of cocaine to persons under the age of eighteen. Rather than construing the word "distribution," however, the superior court found that a viable fetus is not a "person under the age of eighteen" within the meaning of the statute. *Pellegrini*, slip op. at 10. In so finding, the court had to distinguish *Lawrence* and *Cass, supra*, both of which held viable fetuses are "persons" for purposes of criminal laws in Massachusetts.

The Massachusetts trial court found *Lawrence* and *Cass* "accord legal rights to the unborn only where the mother's or parents' interest in the potentiality of life, not the state's interest, are sought to be vindicated." *Pellegrini*, slip op. at 11. In other words, a viable fetus should only be accorded the rights of a person for the sake of its mother or both its parents. Under this rationale, the viable fetus lacks rights of its own that deserve vindication. Whitner suggests we should

---

5. We note that *Pellegrini* was decided by a Massachusetts superior court. To date, no appellate court in Massachusetts has addressed this issue directly.

interpret our decisions in *Hall, Fowler*, and *Horne* to accord rights to the viable fetus only when doing so protects the special parent-child relationship rather than any individual rights of the fetus or any State interest in potential life. We do not think *Hall, Fowler*, and *Horne* can be interpreted so narrowly.

If the *Pellegrini* decision accurately characterizes the rationale underlying *Mone, Lawrence*, and *Cass*, then the reasoning of those cases differs substantially from our reasoning in *Hall, Fowler*, and *Horne, supra.* First, *Hall, Fowler*, and *Horne* were decided primarily on the basis of the meaning of "person" as understood in the light of existing medical knowledge, rather than based on any policy of protecting the relationship between mother and child. As a homicide case, *Horne* also rested on the *State's*—not the mother's—interest in vindicating the life of the viable fetus. Moreover, the United States Supreme Court has repeatedly held that the states have a compelling interest in the life of a viable fetus. *See Roe v. Wade,* 410 U.S. 113, 165, 93 S.Ct. 705, 732–33, 35 L.Ed.2d 147, 183–84 (1973); *see also Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Webster v. Reproductive Health Servs.,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). If, as Whitner suggests we should, we read *Horne* only as a vindication of the mother's interest in the life of her unborn child, there would be no basis for prosecuting a mother who kills her viable fetus by stabbing it, by shooting it, or by other such means, yet a third party could be prosecuted for the very same acts. We decline to read *Horne* in a way that insulates the mother from all culpability for harm to her viable child. Because the rationale underlying our body of law—protection of the viable fetus—is radically different from that underlying the law of Massachusetts, we decline to follow the decision of the Massachusetts Superior Court in *Pellegrini.*

The dissent contends that our holding in this case is inconsistent with *Doe v. Clark,* 318 S.C. 274, 457 S.E.2d 336 (1995). Specifically, it suggests that *Doe v. Clark,* in which we construed another provision of the Children's Code, stands for the proposition that the definition of "child" in S.C.Code Ann. § 20–7–50 (1985) means a "child in being and not a fetus." Contrary to the dissent's characterization of that case, *Doe*

turned on the specific language in the consent provisions of the Adoption Act, S.C.Code Ann. §§ 20–7–1690 and –1700 (Law.Co-op Supp.1994).

In *Doe*, Wylanda Clark, who was pregnant, signed a consent form allowing the Does to adopt the child upon its birth. After the child was born, Clark decided she wanted to keep the baby and attempted to argue that the consent she executed was void because it did not contain certain information required by statute. The trial judge held Clark's consent was valid. Clark appealed.

On appeal, we reversed the trial court. However, the basis for our reversal was not that "child" as defined in the Children's Code only includes born children, but that the adoption statutes contemplate that the natural mother's consent to the adoption must be given after the birth of the child to be adopted. *Doe*, 318 S.C. at 276, 457 S.E.2d at 337. Specifically, section 20–7–1700(A)(3) requires the consent form to contain the race, sex, and *date of birth* of the adoptee, as well as any names by which the adoptee has been known. Clearly, the date of birth requirement could not be fulfilled until after the birth of the child. Furthermore, section 20–7–1690, which specifies who must consent to an adoption, provides that consent is required of "the mother of a child *born* when the mother was not married." (emphasis added). Citing these sections as well as the Children's Code's definition of child, we concluded that a natural mother cannot consent to adoption until after the birth of her child. *Id.* We did *not* hold that the term "child" excludes viable fetuses, nor do we think our holding in *Doe* can be read so broadly.

Finally, the dissent implies that we have ignored the rule of lenity requiring us to resolve any ambiguities in a criminal statute in favor of the defendant. The dissent argues that "[a]t most, the majority only suggests that the term 'child' as used in § 20–7–50 is ambiguous," and that the ambiguity "is created not by reference to our decisions under the Children's Code or by reference to the statutory language and applicable rules of statutory construction, but by reliance on decisions in two different fields of the law, civil wrongful death and common law feticide."

Plainly, the dissent misunderstands our opinion. First, we do not believe the statute is ambiguous and, therefore, the rule of lenity does not apply. Furthermore, our interpretation of the statute is based primarily on the plain meaning of the word "person" as contained *in the statute.* We need not go beyond that language. However, because our prior decisions in *Murphy, Fowler,* and *Horne* support our reading of the statute, we have discussed the rationale underlying those holdings. We conclude that both statutory language and case law compel the conclusion we reach. We see no ambiguity.

## B. *Ineffective Assistance of Counsel*

The State next argues the PCR court erred in holding Whitner received ineffective assistance of counsel. We agree.

To prove ineffective assistance of counsel, a PCR applicant must show (1) deficient performance by her attorney and (2) prejudice resulting therefrom. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove prejudice when challenging a guilty plea, the applicant must show that but for counsel's deficient performance, the applicant would not have pled guilty. *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). In this case, the basis for the ineffective assistance claim was the failure of Whitner's counsel to inform her section 20–7–50 did not apply to prenatal drug use. Whitner contends she would not have pled guilty if her lawyer had given her such advice.

Given our holding that section 20–7–50 *is* applicable to an expectant mother's illegal drug use after the fetus is viable, we cannot say Whitner's lawyer's failure to advise her of the statute's *inapplicability* constituted deficient performance. In fact, both the unambiguous language of the statute and this Court's prior case law justify counsel's belief the child neglect statute applied to Whitner's actions. Therefore, the PCR court erred in ruling Whitner received ineffective assistance of counsel.

## C. *Constitutional Issues*

### 1. Fair Notice/Vagueness

Whitner argues that section 20–7–50 does not give her

fair notice that her behavior is proscribed.[6] We disagree.

The statute forbids any person having legal custody of a child from refusing or neglecting to provide proper care and attention to the child so that the life, health, or comfort of the child is endangered or is likely to be endangered. As we have found above, the *plain* meaning of "child" as used in this statute includes a viable fetus. Furthermore, it is common knowledge that use of cocaine during pregnancy can harm the viable unborn child. Given these facts, we do not see how Whitner can claim she lacked fair notice that her behavior constituted child endangerment as proscribed in section 20–7–50. Whitner had all the notice the Constitution requires.

### 2. Right to Privacy

■ Whitner argues that prosecuting her for using crack cocaine after her fetus attains viability unconstitutionally burdens her right of privacy, or, more specifically, her right to carry her pregnancy to term. We disagree.

Whitner argues that section 20–7–50 burdens her right of privacy, a right long recognized by the United States Supreme Court. *See, e.g., Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). She cites *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), as standing for the proposition that the Constitution protects women from measures penalizing them for choosing to carry their pregnancies to term.

In *LaFleur,* two junior high school teachers challenged their school systems' maternity leave policies. The policies required "every pregnant school teacher to take maternity leave without pay, beginning [four or] five months before the expected birth of her child." *Id.* at 634, 94 S.Ct. at 794, 39 L.Ed.2d at 57. A teacher on maternity leave could not return to work "until the beginning of the next regular school semester which follows the date when her child attains the age of three months." *Id.* at 634–35, 94 S.Ct. at 794, 39 L.Ed.2d at

---

6. In a related argument, Whitner suggests section 20–7–50 is void for vagueness. This argument lacks merit. As we noted in our interpretation of section 20–7–50, *supra, the* same argument could be made about the statute as applied to a child who has already been born.

57. The two teachers, both of whom had become pregnant and were required against their wills to comply with the school systems' policies, argued that the policies were unconstitutional.

The United States Supreme Court agreed. It found that "[b]y acting to penalize the pregnant teacher for deciding to bear a child, overly restrictive maternity leave regulations can constitute a heavy burden on the exercise of these protected freedoms." *Id.* at 640, 94 S.Ct. at 796, 39 L.Ed.2d at 60. The Court then scrutinized [7] the policies to determine whether "the interests advanced in support of" the policy could "justify the particular procedures [the School Boards] ha[d] adopted." *Id.* at 640, 94 S.Ct. at 796, 39 L.Ed.2d at 60. Although it found that the purported justification for the policy—continuity of instruction—was a "significant and legitimate educational goal," the Court concluded that the "absolute requirement[ ] of termination at the end of the fourth or fifth month of pregnancy" was not a rational means for achieving continuity of instruction and that such a requirement "may serve to hinder attainment of the very continuity objectives that they are purportedly designed to promote." *Id.* at 642–43, 94 S.Ct. at 797–98, 39 L.Ed.2d at 61–62. Finding no rational relationship between the purpose of the maternity leave policy and the means crafted to achieve that end, the Court concluded the policy violated the Due Process Clause of the Fourteenth Amendment.

Whitner argues that the alleged violation here is far more egregious than that in *LaFleur*. She first suggests that imprisonment is a far greater burden on her exercise of her freedom to carry the fetus to term than was the unpaid maternity leave in *LaFleur*. Although she is, of course, correct that imprisonment is more severe than unpaid maternity leave, Whitner misapprehends the fundamentally different nature of her own interests and those of the government in this case as compared to those at issue in *LaFleur*.

First, the State's interest in protecting the life and health of the viable fetus is not merely legitimate. It is compelling. *See, e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d

---

7. The Court applied a rational relationship test, the least rigorous form of scrutiny.

147 (1973); *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The United States Supreme Court in *Casey* recognized that the State possesses a profound interest in the potential life of the fetus, not only after the fetus is viable, but *throughout* the expectant mother's pregnancy. *See Casey*, 505 U.S. at 877, 112 S.Ct. at 2821, 120 L.Ed.2d at 716 (plurality opinion).

Even more importantly, however, we do not think any fundamental right of Whitner's—or any right at all, for that matter—is implicated under the present scenario. It strains belief for Whitner to argue that using crack cocaine during pregnancy is encompassed within the constitutionally recognized right of privacy. Use of crack cocaine is illegal, period. No one here argues that laws criminalizing the use of crack cocaine are themselves unconstitutional. If the State wishes to impose additional criminal penalties on pregnant women who engage in this already illegal conduct because of the effect the conduct has on the viable fetus, it may do so. We do not see how the fact of pregnancy elevates the use of crack cocaine to the lofty status of a fundamental right.

Moreover, as a practical matter, we do not see how our interpretation of section 20–7–50 imposes a burden on Whitner's right to carry her child to term. In *LaFleur*, the Supreme Court found that the mandatory maternity leave policies burdened women's rights to carry their pregnancies to term because the policies prevented pregnant teachers from exercising a freedom they would have enjoyed but for their pregnancies. In contrast, during her pregnancy after the fetus attained viability, Whitner enjoyed the same freedom to use cocaine that she enjoyed earlier in and predating her pregnancy—none whatsoever. Simply put, South Carolina's child abuse and endangerment statute as applied to this case does not restrict Whitner's freedom in any way that it was not already restricted. The State's imposition of an additional penalty when a pregnant woman with a viable fetus engages in the already proscribed behavior does not burden a woman's right to carry her pregnancy to term; rather, the additional penalty simply recognizes that a third party (the viable fetus or newborn child) is harmed by the behavior.

Section 20–7–50 does not burden Whitner's right to carry her pregnancy to term or any other privacy right. Accordingly, we find no violation of the Due Process Clause of the Fourteenth Amendment.

## CONCLUSION

For the foregoing reasons, the decision of the PCR Court is REVERSED.

WALLER and BURNETT, JJ., concur.

FINNEY, C.J., and MOORE, J., dissenting in separate opinions.

FINNEY, Chief Justice:

I respectfully dissent, and would affirm the grant of post-conviction relief to respondent Whitner.

The issue before the Court is whether a fetus is a "child" within the meaning of S.C.Code Ann. § 20–7–50 (1985), a statute which makes it a misdemeanor [1] for a "person having legal custody of any child or helpless person" to unlawfully neglect that child or helpless person. Since this is a penal statute, it is strictly construed against the State and in favor of respondent. *State v. Blackmon*, 304 S.C. 270, 403 S.E.2d 660 (1991).

The term child for purposes of § 20–7–50 is defined as a "person under the age of eighteen" unless a different meaning is required by the circumstances. S.C.Code Ann. § 20–7–30(1) (1985). We have already held that this same definition found in another part of the Children's Code means a child in being and not a fetus. *Doe v. Clark*, 318 S.C. 274, 457 S.E.2d 336 (1995). It would be incongruous at best to hold the definition of "child" in the civil context of *Doe* is more restrictive than it is in the criminal context we consider today.

More importantly, it is apparent from a reading of the entire statute that the word child in § 20–7–50 means a child in being and not a fetus. *See Jackson v. Charleston County*

---

1. After this case arose, the statute was amended to change the classification from misdemeanor to felony. 1993 Act No. 184, § 55 (effective January 1, 1994).

*School District,* 316 S.C. 177, 447 S.E.2d 859 (1994) (when construing a statute, we do not view its terms in isolation, but rather in the context of the entire statute and its intended purpose). A plain reading of the entire child neglect statute demonstrates the intent to criminalize only acts directed at children, and not those which may harm fetuses. First, § 20–7–50 does not impose criminal liability on every person who neglects a child, but only on a person having legal custody of that child. The statutory requirement of legal custody is evidence of intent to extend the statute's reach only to children, because the concept of legal custody is simply inapplicable to a fetus. *See Stone v. State,* 313 S.C. 533, 443 S.E.2d 544 (1994) (statutes are construed so as to avoid absurd results). Second, § 20–7–50 refers to S.C.Code Ann. § 20–7–490 (1985 and Supp.1994) for the definition of neglect. Section 20–7–490 defines a neglected child as one harmed or threatened with harm, and further defines harm. § 20–7–490(B), (C), and (D). The vast majority of acts which constitute statutory harm under § 20–7–490 are acts which can only be directed against a child, and not towards a fetus.[2] The reliance upon § 20–7–490 in § 20–7–50 is further evidence that the term child as used in the child neglect statute does not encompass a fetus. Read in context, and in light of the statutory purpose of protecting persons of tender years,[3] it is clear that "child" as used in § 20–7–50 means a child in being. *Jackson v. Charleston County School District, supra.*

At most, the majority only suggests that the term "child" as used in § 20–7–50 is ambiguous. This suggestion of ambiguity is created not by reference to our decisions under the Children's Code or by reference to the statutory language and applicable rules of statutory construction, but by reliance on decisions in two different fields of the law, civil wrongful death and common law feticide. Here, we deal with the Children's Code, and the meaning of language used in a criminal statute under that Code. We have already indicated that a child

---

**2.** Examples include condoning delinquency, using excessive corporal punishment, committing sexual offenses against the child, and depriving her of adequate food, clothing, shelter or education.

**3.** *State v. Jenkins,* 278 S.C. 219, 294 S.E.2d 44 (1982) (construing § 16–3–1030, recodified as § 20–7–50).

within the meaning of § 20–7–90(A) (1985), which criminalizes non-support, must be one already born. *State v. Montgomery,* 246 S.C. 545, 144 S.E.2d 797 (1965) (indictment for violation of predecessor of § 20–7–90(A) fatally defective for failing to identify the child by description or date of birth); *see also Doe v. Clark, supra.* Even if these wrongful death, common law, and Children's Code decisions are sufficient to render the term child in § 20–7–50 ambiguous, it is axiomatic that the ambiguity must be resolved in respondent's favor. *State v. Blackmon, supra.*

I would affirm.

MOORE, Justice:

I concur with the dissent in this case but write separately to express my concerns with today's decision.

In my view, the repeated failure of the legislature to pass proposed bills addressing the problem of drug use during pregnancy is evidence the child abuse and neglect statute is not intended to apply in this instance. This Court should not invade what is clearly the sole province of the legislative branch. At the very least, the legislature's failed attempts to enact a statute regulating a pregnant woman's conduct indicate the complexity of this issue. While the majority opinion is perhaps an argument for what the law *should* be, it is for the General Assembly, and not this Court, to make that determination by means of a clearly drawn statute. With today's decision, the majority not only ignores legislative intent but embarks on a course of judicial activism rejected by every other court to address the issue.

As discussed in the Chief Justice's dissent, we are bound by the rules of statutory construction to strictly construe a criminal statute in favor of the defendant and resolve any ambiguity in her favor. *State v. Blackmon, supra.* I cannot accept the majority's assertion that the child abuse and neglect statute unambiguously includes a "viable fetus." If that is the case, then why is the majority compelled to go to such great lengths to ascertain that a "viable fetus" is a "child?"

Contrary to the majority's strained analysis in this case, one need look no further than the language of § 20–7–50 to clearly discern legislative intent that the statute apply only to chil-

dren in being. "Legal custody" is not a qualification applicable to a viable fetus. I simply disagree the legislature intended a statute entitled "Unlawful neglect of child or helpless person by legal custodian" to render a pregnant woman criminally liable for any type of conduct potentially harmful to the unborn fetus.

In construing this statute to include conduct not contemplated by the legislature, the majority has rendered the statute vague and set for itself the task of determining what conduct is unlawful. Is a pregnant woman's failure to obtain prenatal care unlawful? Failure to quit smoking or drinking? Although the majority dismisses this issue as not before it, the impact of today's decision is to render a pregnant woman potentially criminally liable for myriad acts which the legislature has not seen fit to criminalize. To ignore this "down-the-road" consequence in a case of this import is unrealistic. The majority insists that parents may already be held liable for drinking after a child is born. This is untrue, however, without some further act on the part of the parent. A parent who drinks and then hits her child or fails to come home may be guilty of criminal neglect. The mere fact of drinking, however, does not constitute neglect of a child in being.

The majority attempts to support an overinclusive construction of the child abuse and neglect statute by citing other legal protections extended equally to a viable fetus and a child in being. The only law, however, that specifically regulates the conduct of a mother toward her unborn child is our abortion statute under which a viable fetus is in fact treated differently from a child in being.[1]

The majority argues for equal treatment of viable fetuses and children, yet its construction of the statute results in even greater inequities. If the statute applies only when a fetus is "viable," a pregnant woman can use cocaine for the first twenty-four weeks[2] of her pregnancy, the most dangerous period for the fetus, and be immune from prosecution under

---

1. A woman may have a legal abortion of a viable fetus if necessary to preserve her health, S.C.Code Ann. § 44–41–20(c) (1985), while, of course, she may not justify the death of a child in being on this ground.

2. Viability is presumed to occur no sooner than the twenty-fourth week of pregnancy. S.C.Code Ann. § 44–41–10(1) (1985).

the statute so long as she quits drug use before the fetus becomes viable. Further, a pregnant woman now faces up to ten years in prison for ingesting drugs during pregnancy but can have an illegal abortion and receive only a two-year sentence for killing her viable fetus.[3]

Because I disagree with the conclusion § 20–7–50 includes a viable fetus, I would affirm the grant of post-conviction relief.

---

**3.** S.C.Code Ann. § 44–41–80(b) (1985).