513 S.E.2d 358

Kim D. HOOPER and Beverly G. Hooper, Plaintiffs,

v.

Amy ROCKWELL, Tony Suttles, South Carolina Department of Social Services, Candice Lynn Suttles, Shannon Donna Suttles, and Anthony Robert Edward Suttles, of whom Candice Lynn Suttles, Shannon Donna Suttles, and Anthony Robert Edward Suttles are minors under the age of eighteen years, by their guardian ad litem, Edward Galloway, Defendants.

South Carolina Department of Social Services, Plaintiff,

v.

Amy Suttles Rockwell and Tom Rockwell, Defendants.

In the Matter of Anthony Suttles, Shannon Suttles, Candice Shuttles, and Christopher Perry, minors under the age of eighteen years,

Of whom Amy Rockwell, a/k/a Amy Suttles Rockwell, is Appellant,

and Kim D. Hooper, Beverly G. Hooper, and South Carolina Department of Social Services, are Respondents.

No. 24907.

Supreme Court of South Carolina.

Heard Dec. 3, 1998.

Decided Feb. 22, 1999.

Rehearing Denied April 8, 1999.

John C. Bruton, Jr., and James L. Ward, Jr., both of Sinkler & Boyd, P.A., Columbia, for appellant Amy Suttles Rockwell.

Kellum W. Allen and C. Vance Stricklin, Jr., both of Kirkland, Wilson, Moore, Allen, Taylor & O'Day, P.A., West Columbia, for respondents Kim D. Hooper and Beverly G. Hooper.

Aphrodite K. Konduros of the Office of General Counsel, Columbia, for respondent South Carolina Department of Social Services.

Elisabeth C. Gallant of Columbia for the guardian ad litem, Edward Galloway.

WALLER, Justice:

Amy Suttles Rockwell (appellant) appeals the decision of the family court to terminate her parental rights in three of her children and allow Kim D. Hooper and Beverly G. Hooper (the Hoopers) to adopt the children. We affirm the judgment of the family court.

## FACTS

Law enforcement officers, acting under S.C.Code Ann. § 20–7–610 (Supp.1997), took Anthony Suttles, age seven, into emergency protective custody in April 1991. The officers, responding to a call from Anthony's grandmother, found, Anthony frightened and dripping wet with bruises about his face and neck. Anthony told the officers his mother had choked and repeatedly dunked him in icy bath water after accusing him of stealing tapes.

After further investigation by the Fairfield County Department of Social Services (DSS), a family court judge in May 1991 granted an ex parte request by DSS to take Candice Suttles and her twin sister Shannon Suttles, both age six, and Christopher Perry, age nine, into emergency protective custody. The children had injuries that were inconsistent with the explanations offered by appellant or her boyfriend at the time, Tom Rockwell (Rockwell), DSS told the family court.[1] Appellant also was emotionally unstable and refused to allow DSS into her home or undergo a court-ordered psychological evaluation. The children were placed in foster homes.

In July 1991, appellant and Rockwell entered into a consent order with DSS. They agreed to a finding of a threat of harm to the children, that DSS would retain custody of the children, and that visitation with the children would be suspended until independent psychologists reported their progress and determined the children would not be harmed by visitation. Appellant promised to seek prompt psychological treatment and mental health counseling. Rockwell agreed to undergo a psychological evaluation and mental health counseling. Both agreed to sign the necessary forms for release of psychological reports to DSS.

In October 1991, the family court found appellant and Rockwell in contempt for refusing to comply with the consent order. The court sentenced each to ninety days in jail, suspended upon the completion of psychological evaluations

---

1. Court documents from 1991 name Amy Suttles and Tom Rockwell. They apparently considered themselves married at the time the children were taken into protective custody, but Ms. Suttles had not finalized her divorce from a previous husband. Ms. Suttles and Rockwell were married by a justice of the peace in May 1994.

and compliance with other terms of the consent order. In February 1992, the family court again found appellant and Rockwell in contempt for failing to comply with previous orders and again ordered them to undergo the necessary evaluations and seek mental health counseling. The court sentenced each to twenty-four hours in jail.

In May 1992, the family court, after reviewing the case and hearing testimony by psychologists who had interviewed appellant and the children, ordered that DSS retain custody of the children. Both psychologists diagnosed appellant as suffering from histrionic personality disorder.[2] The court ordered, among other things, that appellant and Rockwell participate in counseling, that appellant pay child support, that DSS have the children evaluated again to ensure the foster parents were not manipulating them, that the children continue with counseling, and that appellant and Rockwell have supervised visitation with the children.

The case was transferred to Richland County in September 1992 after appellant and Rockwell, the foster parents, and the children moved to Richland and Lexington counties. The family court temporarily suspended appellant and Rockwell's visitation rights in January 1993 on the motion of DSS after a particularly disruptive visit. Appellant and Rockwell did not appear at the hearing. In May 1994, the family court again ordered that appellant undergo a psychiatric evaluation, as she previously had been ordered to do in 1991.

## ISSUES

1. Must a party challenge emergency removal orders in a timely appeal filed after the issuance of such orders, or are those orders interlocutory in nature, so that a party may challenge them when appealing a subsequent judg-

---

**2.** Persons afflicted with this disorder exhibit a pervasive pattern of excessive emotionality and attention seeking, usually beginning in early adulthood. They tend to deny problems or blame others for their problems, and often experience rapidly shifting emotional extremes. Their interaction with others often is characterized by inappropriate sexually seductive or provocative behavior. They are easily influenced by others or by circumstances. They engage in superficial relationships, but often believe they are emotionally closer to other people than they really are.

ment in a termination of parental rights proceeding involving the same children?

2. Does S.C.Code Ann. § 20–7–610(A) (Supp.1997) violate the state or federal constitutions?

3. Did the family court err in terminating appellant's parental rights and signing the adoption decree?

## 1. EMERGENCY REMOVAL ORDERS

Appellant raises several issues relating to orders issued as a result of ex parte, merit, and contempt proceedings in 1991 and 1992. Appellant argues the issues are properly before this Court because all orders issued before the August 1996 order terminating her parental rights were interlocutory in nature and not immediately appealable. We disagree.

A law enforcement officer may take a child into emergency protective custody in appropriate circumstances. S.C.Code Ann. § 20–7–610(A) (Supp.1997). In addition, the family court may issue an ex parte order allowing DSS to take a child into emergency protective custody in appropriate circumstances. S.C.Code Ann. § 20–7–610(P) (Supp.1997). DSS must begin a preliminary investigation within twenty-four hours after a child is taken into emergency protective custody to determine whether grounds for assuming legal custody of the child exist. S.C.Code Ann. § 20–7–610(D) (Supp.1997). The family court must hold a probable cause hearing within seventy-two hours of the time the child was taken into custody. S.C.Code Ann. § 20–7–610(M) (Supp.1997).

Upon assuming legal custody of the child, DSS must begin a child protective investigation. On or before the next working day after beginning the investigation, DSS must initiate a removal proceeding in family court. The family court must hold a merit hearing within thirty-five days of receipt of the removal petition to determine whether removal is necessary. S.C.Code Ann. §§ 20–7–610(K) and 20–7–736(E) (Supp.1997). Prosecutors, DSS, and the family court must strictly comply with this schedule of hearings. The family court should order custody be returned to the child's parent or legal guardian if the hearings are not held within ten days after the statutory time limits. *Doe v. State*, 294 S.C. 125, 363

S.E.2d 106 (1987). The family court must review treatment, placement, and permanent plans involving children. S.C.Code Ann. §§ 20–7–762 to –766 (Supp.1997). While the Legislature has amended Section 20–7–610 three times since 1991, the basic process of judicial review—a possible ex parte order, a probable cause hearing, and a merit hearing—has remained the same.[3]

In *Doe v. State, supra,* we concluded a mother who consented to the removal of her children at a merit hearing was barred from later raising statutory and constitutional challenges in the Court of Common Pleas. We indicated the mother could have appealed the order if she had not consented to it.

■ Appellant's case presents similar facts. She consented to the removal of her children in an order dated July 31, 1991, which was issued after a merit hearing. Appellant agreed, among other things, to undergo a psychological evaluation and seek mental health counseling in order to rectify the problems and reunite her family. We hold that appellant may not appeal that consent order because such orders are not appealable. *See Doe v. State, supra; Wilson v. All,* 86 S.C. 586, 68 S.E. 824 (1910) (court will not entertain appeal from an order issued with parties' consent); *Smith v. Lowery,* 56 S.C. 493, 35 S.E. 129 (1900) (same); *Parsons v. Gibbes,* 59 S.C. 215, 37 S.E. 753 (1901) (same); *Calcutt v. Calcutt,* 282 S.C. 565, 320 S.E.2d 55 (Ct.App.1984) (same).

■ We further hold that an ex parte emergency removal order issued by the family court is interlocutory in nature and not immediately appealable. *See Mid–State Distributors, Inc. v. Century Importers, Inc.* 310 S.C. 330, 335, 426 S.E.2d 777, 780 (1993) (teaching that an order is interlocutory "[i]f there is some further act which must be done by the court prior to a determination of the rights of the parties ... or [i]f a judg-

---

3. In 1991, the family court was required to hold a "pretrial" hearing to determine the existence of probable cause within ten days of the initiation of a removal proceeding. The court was required to hold a hearing to determine whether removal of custody was needed within forty days of the initiation of a removal proceeding. Act No. 546, 1988 S.C. Acts 4701; Act No. 489, 1990 Acts 2169 (both codified at S.C.Code Ann. § 20–7–610 (Supp.1991)).

ment determines the applicable law while leaving open questions of fact"); *In the Interest of Lorenzo B.*, 307 S.C. 439, 415 S.E.2d 795 (1992) (order adjudicating a juvenile to be delinquent is not immediately appealable; instead appeal may be taken after imposition of final judgment at dispositional hearing); *State v. Dingle*, 279 S.C. 278, 306 S.E.2d 223 (1983) (ex parte order issued by trial judge in homicide case to have defendant undergo mental examination is not immediately appealable), *abrogated on other grounds, Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); 4 C.J.S. *Appeal and Error* § 102 (1993) (generally no appeal lies from an ex parte order).

■ We also hold, for the same reasons, that an order issued as a result of a probable cause hearing in an emergency removal case is interlocutory in nature and not immediately appealable. At that point, any investigation by law enforcement or DSS, as well as any consideration of the case by the family court, is at such an early stage an appellate court would have little or nothing to review.

■ However, any order issued as a result of a merit hearing, as well as any later order issued with regard to a treatment, placement, or permanent plan, is a final order that a party must timely appeal. At that point, investigators and DSS have presented evidence to the family court, the parents or guardians of the child have had an opportunity to challenge the evidence and present their case, and the family court has decided whether the allegations of the removal petition are supported by a preponderance of the evidence as required by S.C.Code Ann. § 20–7–736(F) (Supp.1997). *See Mid–State Distributors, Inc., supra* (explaining that an order is a final judgment that may immediately be appealed when there is no further act to be done by the court prior to a determination of the rights of the parties); *Culbertson v. Clemens*, 322 S.C. 20, 471 S.E.2d 163 (1996) (stating the general rule that only final judgments are appealable); *Mears v. Mears*, 287 S.C. 168, 337 S.E.2d 206 (1985) (timely service of notice of appeal is jurisdictional requirement and this Court may not extend the time for doing it); Rules 201(a) and 203(b)(3), SCACR.

■ Similarly, a contempt order also is a final order that is immediately appealable. Appellant consented to the issuance

of the contempt order in October 1991 which, as explained above, meant she could not appeal that order. She did not consent to the issuance of the contempt order in February 1992, but failed to timely appeal it. *See Ex Parte Whetstone,* 289 S.C. 580, 347 S.E.2d 881 (1986) (party may refuse to comply with discovery order and then appeal after he is held in contempt for failure to comply); *Jarrell v. Petoseed Co.,* 331 S.C. 207, 500 S.E.2d 793 (Ct.App.1998) (trial court's finding that seller was liable for civil compensatory contempt was immediately appealable even though damages were undetermined and fraud claim had not been decided).

Treating orders issued as a result of merit, contempt, or other subsequent hearings as interlocutory orders, as appellant suggests, would mean parents or guardians would be unable to seek appellate review of DSS's actions and the family court's decisions until someone finally moved to terminate the parents' or guardians' rights. As this case illustrates, years may elapse between the removal of a child from the home and an action to terminate the parents' rights in the child. A system such as appellant suggests would constitute an unacceptable infringement of the parents' rights, as well as delay or prevent timely review of important decisions involving the custody and care of children.

Under our analysis, then, appellant should not have consented to the merit order dated July 31, 1991, or the contempt order in October 1991 if she wished to carry any issues or arguments to an appellate court. She also had to timely appeal any subsequent orders of the family court regarding the custody of her children or the treatment plan that she wished to challenge. Because she consented to the orders or failed to timely appeal them, the issues she now raises are not properly before the Court. *See Mears v. Mears, supra.*

## 2. *CONSTITUTIONALITY OF SECTION 20-7-610(A)*

■■ S.C.Code Ann. § 20-7-610(A) (Supp.1997) authorizes a law enforcement officer to take a child into emergency protective custody without the consent of the child's parents or guardians if the officer has probable cause to believe the child, by reason of abuse or neglect, is in imminent danger and there is no time to apply for a court order.

Appellant contends Section 20–7–610(A) violates the federal constitution. She cites the right of marital privacy established in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and the principle that parents have a constitutionally guaranteed parental prerogative in the education of children. Appellant further contends Section 20–7–610(A) violates Article I, Sections 3 and 10 of the state constitution when read in conjunction with the interpretation clause of Article I, Section 23. Article I, Section 3 ensures the government may not abridge the privileges and immunities of its citizens without due process, and provides for equal protection under the law. Article I, Section 10 prohibits unreasonable searches, seizures, or invasions of privacy. Article I, Section 23 states that constitutional provisions shall be construed to be mandatory unless expressly made permissive. Finally, appellant cites the principle that a state may construe its own constitutional protections in a manner that provides more protection to citizens than does the federal constitution.

Drawing upon the various provisions, appellant asserts that "familial privacy includes the right to raise one's children as one sees fit, free from interference by the State or anyone else.... Any statutory scheme that purports to invade, without prior judicial review, rights of the citizens of this State to be left alone, to raise their families as they see fit, cannot be constitutional...." We disagree.

Appellant first presented her arguments to the family court at a motions hearing held about three months before the termination of parental rights hearing in 1996. As explained in Issue 1, she should have raised her arguments in seeking the immediate return of her children at the merit hearing in July 1991, and then timely appealed any rejection of those arguments. Nevertheless, we address the issue for the benefit of the bench and bar because we previously have not explicitly considered the appealability of various emergency removal orders.

The parties have cited no case, and we have found none, that addresses a "familial privacy" argument exactly as appellant has framed it. The underlying issue—how best to balance the rights and duties of parent, child, and society in a child neglect or abuse case—involves an enduring debate

among courts, lawmakers, and the public at large.[4] Numerous courts, however, have rejected constitutional challenges to emergency protective custody statutes designed to protect abused or neglected children. Courts uniformly have concluded that, while parents have a constitutionally protected liberty interest in the care and custody of their children, that right is not absolute. In an emergency where imminent harm is likely, a government officer or agency acting under statutes with specific guidelines may remove children from their home and take them into protective custody without parental consent or prior judicial review. Courts also recognize that such cases are fundamentally different from a typical criminal case. *E.g., White by White v. Chambliss*, 112 F.3d 731, 735 (4th Cir.) (noting that South Carolina's emergency protective custody statute is constitutional under Fourth Circuit precedent), *cert. denied*, —— U.S. ——, 118 S.Ct. 296, 139 L.Ed.2d 228 (1997); *Thomason v. SCAN Volunteer Services, Inc.*, 85 F.3d 1365 (8th Cir.1996) (parents' liberty interest in familial relations is limited by government's compelling interest in the protection of minors; removal of child did not violate parents' due process rights where a physician found reasonable suspicion of life-threatening abuse in the home); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 341–56 (4th Cir.1994) (rejecting due process and equal protection challenges to Virginia's emergen-

---

4. *See* Manvinder Gill, *Protecting the Abused Child: It Is Time to Reevaluate Judicial Preference for Preserving Parental Custody Rights Over the Rights of the Child To Be Free From Physical Abuse and Sexual Exploitation*, 18 J.Juv.L. 67 (1997) (arguing that too many courts "pay mindless obeisance to the sacred cow of parental rights" even when abuse is apparent, and criticizing a recent movement of parental rights activists as "a throwback to the antiquated and discredited 'children as chattel' mentality" prevalent in years past); Barbara B. Woodhouse, *A Public Role in the Private Family: the Parental Rights and Responsibilities Act and the Politics of Child Protection and Education*, 57 Ohio St.L.J. 393 (1996) (identifying numerous shortcomings of a recent federal bill supported by parental rights activists, and arguing children have "needs-based rights" for which most Americans are willing to share responsibility); Julie S. Rappaport, *The Legal System's Response to Child Abuse: A "Shield" for the Children or a "Sword" Against the Constitutional Rights of Parents?*, 9 N.Y.L.Sch.J.Hum.Rts. 257 (1991) (arguing that courts' recent responses to the problem of child abuse appear to be skewed against the alleged parental abuser, and suggesting the present system often violates the abuser's rights under the Fourth, Fifth, and Sixth Amendments).

cy protective custody statute, which is similar to South Carolina's; court thoroughly discussed the important interests of parent, child, and government that it had to consider); *Dietz v. Damas,* 932 F.Supp. 431, 444 (E.D.N.Y.1996) (rejecting due process challenge to emergency protective custody statute, and noting it is widely recognized that child abuse proceedings, especially emergency removals, involve special interests that differ from criminal cases); West's Digests, *Constitutional Law,* Key No. 274(5); *Infants,* Key Nos. 132, 154.

We do not believe familial privacy prevents authorities from investigating whether a mother is choking and dunking her seven-year-old son in icy bath water, or taking a child into emergency protective custody in such a situation. Appellant's argument ignores the statutory right of a child to be free of abusive or neglectful situations, which is a central purpose of the Children's Code. *E.g.,* S.C.Code Ann. § 20–7–20 (1985 & Supp.1997) (establishing children's policy); S.C.Code Ann. § 20–7–480 (Supp.1997) (establishing principles that those involved in child welfare services must follow when intervening in a family's life); S.C.Code Ann. § 20–7–490 (Supp.1997) (defining abuse and neglect); S.C.Code Ann. §§ 20–7–50 to – 70 (Supp.1997) (making it a crime to harm or neglect a child).

This Court long has tried to decide all matters involving the custody or care of children in "light of the fundamental principle that the controlling consideration is the best interests of the child." *In Re Doran,* 129 S.C. 26, 31, 123 S.E. 501, 503 (1924); *accord Woodall v. Woodall,* 322 S.C. 7, 471 S.E.2d 154 (1996); *Harrison v. Ballington,* 330 S.C. 298, 498 S.E.2d 680 (Ct.App.1998). Similarly, the Legislature in recent years has placed an increasing emphasis on the best interests of the child in abuse and neglect cases. *See* Janet T. Butcher, *What Lawyers Need to Know About Child Abuse and Neglect in 1998,* South Carolina Lawyer, Nov./Dec.1998, at 15. To accept appellant's argument would be an unwise retreat from that principle. Accordingly, we hold that Section 20–7–610(A), part of an emergency protective custody statute with specific deadlines and detailed procedures that safeguard the rights of parents and their children, does not violate the state or federal constitutions.

### 3. TERMINATION OF PARENTAL RIGHTS AND ADOPTION

Appellant contends the evidence does not support the family court's findings of fact or the decision to terminate appellant's parental rights and allow the Hoopers to adopt Anthony and his twin sisters, Candice and Shannon. We disagree.

In November 1995, more than four years after her children were removed from the home, appellant asked the family court to dismiss the case and return her four children to her. Two weeks after appellant filed her motion, the Hoopers filed an action in family court seeking to terminate the parental rights · of appellant and the natural father,[5] and adopt Anthony, Candice, and Shannon.

The family court terminated appellant's parental rights on four grounds contained in S.C.Code Ann. § 20–7–1572 (Supp. 1997): appellant's willful failure to pay support, severe and repetitious abuse by appellant, failure of appellant to remedy conditions in the home, and appellant's diagnosable condition. The family court decreed it was in the best interests of the children to be adopted by the Hoopers.

■ The public policy of this state in child custody matters is to reunite parents and children. S.C.Code Ann. § 20–7–20(D) (1985); *Hopkins v. South Carolina Dep't of Social Services,* 313 S.C. 322, 437 S.E.2d 542 (1993). When reunification is not possible or appropriate and a party moves to terminate the parents' rights, that party must prove a ground for termination of parental rights by clear and convincing evidence. *Richland County Dep't of Social Services v. Earles,* 330 S.C. 24, 496 S.E.2d 864 (1998); *Greenville County Dep't of Social Services v. Bowes,* 313 S.C. 188, 437 S.E.2d 107 (1993) (citing *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).[6]

---

**5.** The natural father, Tony Suttles, relinquished his parental rights and consented to the adoption pursuant to S.C.Code Ann. §§ 20–7–1700 and –1705 (Supp.1997.) He is not a party in this appeal.

**6.** Effective January 1, 1997, a family court judge is required to make the additional finding that termination is in the best interest of the child. S.C.Code Ann. § 20–7–1572 (Supp.1997).

In reviewing a termination of parental rights, the appellate court has the authority to review the record and make its own findings of whether clear and convincing evidence supports the termination. *Richland County Dep't of Social Services, supra; South Carolina Dep't of Social Services v. Brown,* 317 S.C. 332, 454 S.E.2d 335 (Ct.App.1995). The appellate court is not, however, required to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Cherry v. Thomasson,* 276 S.C. 524, 280 S.E.2d 541 (1981).

## A. WILLFUL FAILURE TO PAY SUPPORT

The family court found that appellant willfully failed to pay child support or materially contribute to the children's care for multiple six-month periods during the five years the children had been in foster care. *See* S.C.Code Ann. § 20-7-1572(4). Appellant argues she never received notice of the hearing at which she was required to pay support.

Whether a parent's failure to visit or support a child is "willful" within the meaning of the statute is a question of intent to be determined in each case from all the facts and circumstances. The family court is given wide discretion in making this determination, which must be established by clear and convincing evidence. *South Carolina Dep't of Social Services v. Broome,* 307 S.C. 48, 413 S.E.2d 835 (1992). "Conduct of the parent which evinces a settled purpose to forego parental duties may fairly be characterized as 'willful' because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent." *Id.* at 53, 413 S.E.2d at 838.

A family court judge ordered appellant in November 1993 to pay $174 per month in child support. The record shows appellant paid $583 in April 1994 after a judge issued a bench warrant for her arrest due to non-payment. She paid $4,475 in May 1996, one day before the hearing began on the termination of her parental rights. She made no other payments. The record refutes appellant's assertion that she never received notice of the support hearing. Although appellant initially testified she never received notice of the support

hearing, she admitted on cross-examination she knew she was supposed to pay child support.

While appellant needed counseling to address her mental health problems, she was capable of doing everyday tasks, psychologists testified. She had been employed in the past, including four years at a fast food restaurant and four years at a jewelry shop. Appellant testified she could not afford to pay child support because she did not have a job. She considered her effort to regain custody of her children a full-time job.

We conclude that clear and convincing evidence supports the family court's decision to terminate appellant's parental rights on this ground. Appellant could have worked and paid child support. If she could not afford to pay $174 a month, she could have asked the court to reduce it or at least materially contributed in some way to her children's support. Instead, she did nothing.

## B.  SEVERE AND REPETITIOUS ABUSE

■■■ The family court found the children had been physically harmed in the home and, due to the severity or repetition of the abuse or neglect, it was not reasonably likely appellant could make the home safe within twelve months. *See* S.C.Code Ann. § 20–7–1572(1). Appellant argues the record does not support that conclusion. She also asserts that repeatedly dunking a child in bath water does not constitute physical injury as defined in S.C.Code § 20–7–490(6) (Supp. 1997) (physical injury means "death or permanent or temporary disfigurement or impairment of any bodily organ or function").

In reaching its conclusion, the family court relied upon the testimony of law enforcement officers who found Anthony frightened, dripping wet, and bruised when they were called to appellant's home in April 1991. One officer testified that appellant admitted she had dunked Anthony to "punish" him. Three clinical psychologists, a psychiatrist, and a professional counselor testified they believed Anthony, Candice, and Shannon had been physically abused. The children were extremely anxious about life generally, they were frightened and angry when appellant visited them, and they did not want to return home. All agreed that returning the children to appellant's

home would be the wrong decision—a "devastating occurrence" in the counselor's words. All believed adoption by the Hoopers was the right decision.

■ We conclude that clear and convincing evidence supports the family court's decision to terminate appellant's parental rights on this ground. Furthermore, repeatedly dunking a seven-year-old child in icy bath water constitutes physical injury under Section 20–7–490(6) because it temporarily impairs the child's ability to breathe and, if it continued, would drown the child. *Cf. Florence County Dep't of Social Services v. Ward*, 310 S.C. 69, 425 S.E.2d 61 (Ct.App. 1992) (affirming family court's finding that foster parent did not physically abuse or mentally injure child as result of punishing child by splashing cool or cold water on him; there was no evidence that child suffered any permanent or lasting physical damage from the isolated incident, and record reflected that manner of punishment had been recommended by authority in field of child discipline).

## C. . FAILURE TO REMEDY CONDITIONS IN THE HOME

■ The family court found that the children had been out of the home for six months and appellant had not remedied the conditions which caused the removal. *See* S.C.Code Ann. § 20–7–1572(2). Appellant contends the record does not support such a finding.

In reaching its conclusions, the family court pointed to the repeated efforts of DSS and the multiple opportunities appellant had to obtain mental health counseling and comply with treatment plans. DSS developed at least a dozen treatment plans and the primary goal from 1991 to 1993 was to reunite the family. But appellant repeatedly refused to sign treatment plans, attend counseling to address her personality disorder, pay support, or even sign release forms for DSS to obtain information from the mental health professionals who examined her.

The record shows that appellant refused to acknowledge she had any problems, but instead blamed everyone in sight. She was twice held in contempt for refusing to comply with treatment plans. She believed law enforcement, DSS, school

officials, the family court, the guardian ad litem, and the mental health professionals all were engaged in a continuing conspiracy to steal her children and possibly sell them on the black market. Appellant testified the April 1991 incident involving Anthony was nothing more than a "major misunderstanding," and denied her children were ever abused in any way. Rockwell, appellant's husband, also testified at length about the alleged conspiracy.

In one bizarre example, appellant accused law enforcement and DSS officials of taking her children out of school to go on a train ride and to a state park. An investigation revealed there were no trains anywhere in the area where she allegedly saw it, and one alleged participant in the outing was in prison at the time. The numerous allegations against law enforcement eventually prompted the Fairfield County sheriff to turn the entire case over to the State Law Enforcement Division.

We conclude that clear and convincing evidence supports the family court's decision to terminate appellant's parental rights on this ground. *See South Carolina Dep't of Social Services v. Broome, supra* (affirming decision to terminate rights of mother who suffered from a chronic mental condition where mother failed to visit or support the child).

## D. DIAGNOSABLE CONDITION

The family court found that appellant had a diagnosable condition not likely to change within a reasonable period of time, and the condition made her unlikely to provide minimally acceptable care for the children. *See* S.C.Code Ann. § 20–7–1572(6). Appellant does not challenge this conclusion on appeal. Accordingly, it is the law of the case. *E.g., Dobyns v. South Carolina Dep't of Parks, Recreation, and Tourism,* 325 S.C. 97, 480 S.E.2d 81 (1997) (unchallenged ruling by the trial court becomes law of the case).

## E. ADOPTION BY THE HOOPERS

The family court signed an adoption decree allowing the Hoopers to adopt Anthony, Candice, and Shannon. Appellant argues the record does not support the family court's decision.

In order for the court to issue a valid adoption decree, it must appear that the parent has consented or

otherwise forfeited his or her parental rights. *Gardner v. Baby Edward,* 288 S.C. 332, 342 S.E.2d 601 (1986). Consent or relinquishment for the purpose of adoption is not required of a parent whose rights have been terminated pursuant to S.C.Code Ann. §§ 20–7–1560 to –1582 (1985 & Supp.1997). *See* S.C.Code Ann. § 20–7–1695(A)(1) (Supp.1997). The burden of proving, by the greater weight or preponderance of the evidence, that adoption is the proper course of action rests upon the party who wishes to adopt a child. *See D'Augustine v. Bush,* 269 S.C. 342, 237 S.E.2d 384 (1977). Adoptions are equitable proceedings, and therefore, this Court has jurisdiction to find facts in accordance with its view of the preponderance of the evidence. *Adoptive Parents v. Biological Parents,* 315 S.C. 535, 446 S.E.2d 404 (1994); *Phillips v. Baker,* 284 S.C. 134, 325 S.E.2d 533 (1985).

██ Anthony, now fourteen years old, and Candice and Shannon, now thirteen years old, have lived with the Hoopers for the past seven years. The record shows the Hoopers have provided a stable, caring home for the children. The mental health professionals who evaluated appellant, her husband, and the children, as well as the children's guardian ad litem, believed adoption by the Hoopers was the best choice for the children. Accordingly, we affirm the decision of the family court.

## CONCLUSION

We conclude that various issues raised by appellant with regard to orders issued and hearings held in 1991 and 1992 are not properly before the Court for the reasons outlined in Issue 1. We further conclude that S.C.Code Ann. § 20–7–610(A) (Supp.1997) does not violate the state or federal constitutions. Finally, we affirm the judgment of the family court in terminating appellant's parental rights and signing an adoption decree allowing the Hoopers to adopt Anthony and his sisters, Candice and Shannon.

AFFIRMED.

FINNEY, C.J., TOAL, MOORE and BURNETT, JJ., concur.