576 S.E.2d 168

**The STATE, Respondent,**

v.

**Regina D. McKNIGHT, Appellant.**

No. 25585.

Supreme Court of South Carolina.

Heard Nov. 6, 2002.

Decided Jan. 27, 2003.

636

638

640

C. Rauch Wise, of Greenwood, Jodie L. Kelley, Matthew Hersh, Oliver A. Sylvain, all of Washington, and Lynn M. Paltrow, of New York, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia, and John Gregory Hembree, of Conway, for respondent.

Joseph M. McCulloch, Jr., of Columbia, Judith K. Appel and Daniel N. Abrahamson, of Oakland, Susan King Dunn, of Charleston, and William S. Bernstein, of New York, for amicus curiae.

JUSTICE WALLER:

Appellant, Regina McKnight was convicted of homicide by child abuse; she was sentenced to twenty years, suspended upon service of twelve years. We affirm.

## FACTS

On May 15, 1999, McKnight gave birth to a stillborn five-pound baby girl. The baby's gestational age was estimated to be between 34–37 weeks old. An autopsy revealed the presence of benzoylecgonine, a substance which is metabolized by cocaine. The pathologist, Dr. Proctor, testified that the only way for the infant to have the substance present was through cocaine, and that the cocaine had to have come from the mother.[1] Dr. Proctor testified that the baby died one to three

---

1. He testified that because of the rapid breakdown of pure cocaine, a baby would always have benzoylecgonine in its system, rather than pure cocaine.

days prior to delivery. Dr. Proctor determined the cause of death to be intrauterine fetal demise with mild chorioamnionitis, funisitis [2] and cocaine consumption. He ruled the death a homicide. McKnight was indicted for homicide by child abuse. A first trial held Jan. 8–12, 2002 resulted in a mistrial.[3] At the second trial held May 14–16, 2001, the jury returned a guilty verdict. McKnight was sentenced to twenty years, suspended to service of twelve years.

## ISSUES

1. Did the Court err in refusing to direct a verdict on the grounds that a) there was insufficient evidence of the cause of death, b) there was no evidence of criminal intent, and c) there was no evidence the baby was viable when McKnight ingested cocaine?

2. Did the Court err in refusing to dismiss the homicide by child abuse indictment on the grounds that a) the more specific criminal abortion statute governs, b) the statute does not apply to the facts of this case, and c) the legislature did not intend the statute to apply to fetuses?

3. Does application of the homicide by child abuse statute to McKnight violate her due process right of adequate notice?

4. Does application of the homicide by child abuse statute to McKnight violate her constitutional right to privacy?

5. Did the trial court err in refusing to dismiss the indictment on eighth amendment cruel and unusual punishment grounds?

6. Does application of the homicide by child abuse statute to McKnight violate equal protection?

---

2. He testified that chorioamnionitis and funisitis is the medical term given to the placenta and umbilical cord when they are inflamed, which can be caused by an underlying infection, but that most children with these conditions have live births.

3. McKnight was also indicted for distribution of cocaine. The court dismissed the distribution charge. A separate appeal from that ruling remains pending in this Court.

7. Did the trial court err in refusing to exclude evidence of the results of a urine specimen taken from McKnight shortly after the stillbirth, on grounds that the specimen was obtained in violation of her fourth amendment rights?

## 1. DIRECTED VERDICT

McKnight asserts the trial court erred in refusing to direct a verdict for her on the grounds that a) there was insufficient evidence of the cause of death, b) there was no evidence of criminal intent, and c) there was no evidence the baby was viable when McKnight ingested the cocaine. We disagree.

A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. McHoney,* 344 S.C. 85, 97, 544 S.E.2d 30, 36 (2001). In reviewing a motion for directed verdict, the trial judge is concerned with the existence of the evidence, not with its weight. *State v. Mitchell,* 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000). On appeal from the denial of a directed verdict, an appellate court must view the evidence in the light most favorable to the State. *State v. Burdette,* 335 S.C. 34, 46, 515 S.E.2d 525, 531 (1999). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury. *State v. Pinckney,* 339 S.C. 346, 529 S.E.2d 526 (2000).

### a. Cause of Death

McKnight asserts the state failed to introduce sufficient evidence demonstrating that cocaine caused the stillbirth. We disagree.

Dr. Proctor, who performed the autopsy and who was qualified as an expert in criminal pathology, testified that the only way for the infant to have benzoylecgonine present was through cocaine, and that the cocaine had to have come from the mother. Dr. Proctor determined the cause of death to be intrauterine fetal demise with mild chorioamnionitis, funisitis and cocaine consumption. Dr. Proctor ruled the death a homicide.

Another pathologist, Dr. Woodward, who was qualified as an expert in pediatric pathology testified that the gestational age of the infant was between 35–37 weeks, and that it was viable. He then described how one determines the cause of death of a viable fetus, by looking for abnormalities, placental defects, infections, and the chemical constituency of the child. He explained the effect that cocaine would have on both an adult and a child. He testified that the placenta was the major heart-lung machine while the baby was inutero and that cocaine usage can produce degeneration of the small blood vessels in the placenta. He stated that he found areas of pinkish red degeneration of the blood vessels which were consistent with cocaine exposure. He testified that he did not see any other indications of the cause of death, and found a lack of evidence of other infections, lack of other abnormalities, otherwise normal development of the child, it's size, weight, and lung development. Although Dr. Woodward agreed with Dr. Proctor that chorioamnionitis and mild funisitis were present, he testified that to a reasonable degree of medical certainty, those conditions had not caused the death of the infant. He also opined that neither syphilis, nor placental abruption killed the infant. He concluded that, to a reasonable degree of medical certainty, the cause of death was intrauterine cocaine exposure. Although Woodward could not say the exact mechanism by which the cocaine had killed the infant, he testified the mechanisms through cardiac function, placental functions, are seen as most probable. On cross-exam, Woodward testified that he believed the death was caused solely by the cocaine effect, and that the drugs could have caused the baby's heart to stop, or to have caused the baby's heart to rise precipitously putting the baby in congestive heart failure. He explained the lack of abnormalities in the heart found by Dr. Proctor's autopsy, stating, I wouldn't expect to see specific indices in the heart if the heart just stopped or if the heart went into congestive heart failure. Finally, Woodward testified he had seen both children and adults dead with less benzoylecgonine in their systems than McKnight's baby.

Although McKnight's expert, Dr. Conradi, would not testify that cocaine had caused the stillbirth, she did testify that cocaine had been in the baby at one point. She also ruled out

the possibility of chorioamnionitis, funisitis or syphilis as the cause of death.

Viewing the expert testimony in the light most favorable to the state, we find sufficient evidence to withstand a directed verdict. *McHoney, supra.* Any defect in the expert testimony went to its weight, a defect McKnight was free to challenge with her own evidence.

### b. Criminal Intent

■ McKnight next asserts she was entitled to a directed verdict as the state failed to prove she had the requisite criminal intent to commit homicide by child abuse. We disagree.

Under S.C.Code Ann. § 16–3–85(A), a person is guilty of homicide by child abuse if the person causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life. McKnight claims there is no evidence she acted with extreme indifference to human life as there was no evidence of how likely cocaine is to cause stillbirth, or that she knew the risk that her use of cocaine could result in the stillbirth of her child.

Recently, in *State v. Jarrell,* 350 S.C. 90, 97, 564 S.E.2d 362, 366 (Ct.App.2002), the Court of Appeals defined extreme indifference, as used in the homicide by child abuse statute, stating:

> In this state, indifference in the context of criminal statutes has been compared to the conscious act of disregarding a risk which a person's conduct has created, or a failure to exercise ordinary or due care. See *State v. Rowell,* 326 S.C. 313, 315, 487 S.E.2d 185, 186 (1997) (discussing the requisite mental state for recklessness); *see generally Hooper v. Rockwell,* 334 S.C. 281, 297, 513 S.E.2d 358, 367 (1999) ("Conduct of the parent which evinces a settled purpose to forego parental duties may fairly be characterized as willful because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent."). At least one other jurisdiction with a similar statute has found that "[a] person acts 'under circumstances manifesting extreme indifference to the value of human life'

when he engages in deliberate conduct which culminates in the death of some person." *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768, 773 (1996). Therefore, we . . . hold that in the context of homicide by abuse statutes, extreme indifference is a mental state akin to intent characterized by a deliberate act culminating in death.

Similarly, in reckless homicide cases, we have held that reckless disregard for the safety of others signifies an indifference to the consequences of one's acts. It denotes a conscious failure to exercise due care or ordinary care or a conscious indifference to the rights and safety of others or a reckless disregard thereof. *See State v. Tucker*, 273 S.C. 736, 259 S.E.2d 414 (1979).

In *Whitner v. State*, 328 S.C. 1, 10, 492 S.E.2d 777, 782 (1997), *cert. denied* 523 U.S. 1145, 118 S.Ct. 1857, 140 L.Ed.2d 1104 (1998), this Court noted that although the precise effects of maternal crack use during pregnancy are somewhat unclear, it is well documented and within the realm of public knowledge that such use can cause serious harm to the viable unborn child. Given this common knowledge, Whitner was on notice that her conduct in utilizing cocaine during pregnancy constituted child endangerment. *Id.* at 16, 492 S.E.2d at 785. Indeed, more than twelve years ago, Justice Toal wrote:

> The drug "cocaine" has torn at the very fabric of our nation. Families have been ripped apart, minds have been ruined, and lives have been lost. It is common knowledge that the drug is highly addictive and potentially fatal. The addictive nature of the drug, combined with its expense, has caused our prisons to swell with those who have been motivated to support their drug habit through criminal acts. In some areas of the world, entire governments have been undermined by the cocaine industry.

*State v. Major*, 301 S.C. 181, 391 S.E.2d 235 (1990).

Here, it is undisputed that McKnight took cocaine on numerous occasions while she was pregnant, that the urine sample taken immediately after she gave birth had very high concentrations of cocaine, and that the baby had benzoylecgonine in its system. The DSS investigator who interviewed McKnight shortly after the birth testified that McKnight admitted she knew she was pregnant and that she had been

using cocaine when she could get it, primarily on weekends. Given the fact that it is public knowledge that usage of cocaine is potentially fatal, we find the fact that McKnight took cocaine knowing she was pregnant was sufficient evidence to submit to the jury on whether she acted with extreme indifference to her child's life. Accordingly, the trial court correctly refused a directed verdict. *State v. Pinckney, supra* (if the State presents any evidence which reasonably tends to prove defendant's guilt, or from which defendant's guilt could be fairly and logically deduced, case must go to the jury).

### c. Viability

■ Finally, McKnight asserts she was entitled to a directed verdict as there was no evidence the baby was viable at the time she ingested cocaine. This argument was not raised in McKnight's motions to dismiss. Nor was it ruled on by the trial court. Accordingly, this argument is unpreserved. *State v. Hicks*, 330 S.C. 207, 499 S.E.2d 209, *cert. denied*, 525 U.S. 1022, 119 S.Ct. 552, 142 L.Ed.2d 459 (1998) (issue must be raised to and ruled upon by trial court to be preserved for review).

### 2. DIMISSAL OF HOMICIDE INDICTMENT

McKnight next asserts the trial court erred in refusing to dismiss the homicide by child abuse indictment on the grounds that a) the more specific criminal abortion statute governs, b) the homicide by child abuse statute does not apply to the facts of this case, and c) the legislature did not intend the statute to apply to fetuses. We disagree.

### a. Criminal Abortion Statute

■ Initially, McKnight asserts the criminal abortion statute, S.C.Code Ann. § 44–41–80, is a more specific statute which controls under the circumstances of this case. McKnight did not raise this contention to the trial court. Contrary to the assertions in her reply brief, although McKnight did argue that the statute was inapplicable to the circumstances of this case, at no time did she assert that the criminal abortion statute was the more specific, controlling statute. Accordingly, this issue is unpreserved. *State v.*

*Hicks, supra* (issue must be raised to and ruled upon by trial court to be preserved for review).

### b. Application of Homicide by Abuse Statute in This Case

 McKnight next asserts the Legislature did not intend the homicide by child abuse statute apply to the stillbirth of a fetus. We disagree.

McKnight asserts the term child, as used in the statute, is most naturally read as including only children already born. *See* S.C.Code Ann. § 16–3–85(B). In several cases this Court has specifically held that the Legislature's use of the term child includes a viable fetus. *State v. Ard,* 332 S.C. 370, 505 S.E.2d 328 (1998); *Whitner v. State,* 328 S.C. 1, 492 S.E.2d 777 (1997); *State v. Horne,* 282 S.C. 444, 319 S.E.2d 703 (1984). McKnight cites to portions of the statute defining harm as relating to corporal punishment and/or abandonment; she asserts this demonstrates that the statute was clearly intended to apply only to children already born. However, section 16–3–85(B) also defines harm as inflicting or allowing to be inflicted on the child physical injury ... and failing to supply the child with adequate health care ... Either of these provisions may clearly be applied to an unborn child. Accordingly, given the language of the statute, and this Court's prior opinions defining a child to include a viable fetus, we find the plain language of the statute does not preclude its application to the present case.

### c. Legislative History

 McKnight lastly asserts that the legislative history of section 16–3–85 conclusively demonstrates that it does not apply to unborn children. We find this contention unpersuasive.

Section 16–3–85 was amended by 2000 Acts No. 261, § 1. The prior statute read that a person is guilty of homicide by child abuse who causes the death of a child under the age of eleven while committing child abuse or neglect **as defined in Section 20–7–490,**[4] and the death occurs under circumstances

---

4. Section 20–7–490 is contained in the Children's Code and defines child as a person under the age of eighteen and also defines abused or neglected child, and harm.

manifesting an extreme indifference to human life. (Emphasis supplied). The effect of the 2000 amendment was the deletion of the reference to the definitions of abuse and neglect contained in section 20–7–490, and the addition of subsection (B), defining those terms as follows:

(1) "child abuse or neglect" means an act or omission by any person which causes harm to the child's physical health or welfare;

(2) "harm" to a child's health or welfare occurs when a person:

(a) inflicts or allows to be inflicted upon the child physical injury, including injuries sustained as a result of excessive corporal punishment;

(b) fails to supply the child with adequate food, clothing, shelter, or health care, and the failure to do so causes a physical injury or condition resulting in death; or

(c) abandons the child resulting in the child's death.

There is a presumption that the legislature has knowledge of previous legislation as well as of judicial decisions construing that legislation when later statutes are enacted concerning related subjects. *State v. Corey D.*, 339 S.C. 107, 529 S.E.2d 20 (2000); *Berkebile v. Outen*, 311 S.C. 50, 426 S.E.2d 760 (1993). The homicide by child abuse statute was amended in May 2000, some three years after this Court, in *Whitner*, had specifically held that the term child includes a viable fetus.[5] The fact that the legislature was well aware of

---

**5.** We granted McKnight's motion to argue against the precedent of *Whitner v. State, supra.* We adhere to our opinion in *Whitner.* As did Whitner, McKnight forebodes a parade of horribles and points to commentators who object to the prosecution of pregnant women as being contrary to public policy and deterring women from seeking appropriate medical care and/or creating incentives for women to seek abortions to avoid prosecution. *See e.g.* Tolliver, *Child Abuse Statute Expanded to Protect the Viable Fetus: The Abusive Effects of South Carolina's Interpretation of the Word Child*, 24 S.Ill.U.L.J. 383 (Winter 2000); DeLouth, *Pregnant Drug Addicts As Child Abusers: A South Carolina Ruling*, 14 Berkeley Women's L.J. 96 (1999).

However, not all of the commentaries concerning *Whitner* have been critical. *See* Miller, *Fetal Neglect and State Intervention: Preventing Another Attleboro Cult Baby Death*, 8 Cardozo Women's L.J. 71 (2001)(suggesting that the state's interest in protecting the life of the fetus takes precedence over any rights the mother may have and that

this Court's opinion in *Whitner*, yet failed to omit viable fetus from the statute's applicability, is persuasive evidence that the legislature did not intend to exempt fetuses from the statute's operation. Contrary to McKnight's assertion, we do not find the legislature's decision to define the terms abuse and neglect within the confines of section 16-3-85, deleting the reference to section 20-7-490 of the Children's Code, in any way evinces a retraction from our opinion in *Whitner*. Although *Whitner* did examine the policy and purpose of the Children's Code, that discussion was not central to our holding. More fundamentally, *Whitner* found no basis upon which to grant a viable fetus the status of a person for purposes of homicide and wrongful death laws, while denying such status in the context of child abuse. Indeed, if the legislature had intended to remove a fetus from the operation of the statute, it could have plainly said so. *Stardancer Casino v. Stewart*, 347 S.C. 377, 556 S.E.2d 357 (2001); *Tilley v. Pacesetter*, 333 S.C. 33, 508 S.E.2d 16 (1998) (if legislature had intended certain result in statute it would have said so).

### 3. DUE PROCESS/NOTICE

 McKnight next asserts application of the homicide by child abuse statute to her violates due process; she contends she had no notice the statute could be applied to a woman whose fetus is stillborn. We disagree.

---

the fetus has the right to be protected by the State as soon as the fetus is viable or when a woman can no longer obtain a legal abortion); Janssen, *Fetal Rights and the Prosecution of Women For Using Drugs During Pregnancy*, 48 Drake L.Rev. 741 (2000); Schueller, *The Use of Cocaine by Pregnant Women: Child Abuse or Choice* ? 25 J. Legisl. 163 (1999). As noted by Janssen, although the threat of abortion or lack of prenatal care is real, the burden placed on pregnant substance abusers is not the burden to get an abortion. Rather the burden is on the woman to stop using illegal drugs once she has exercised her constitutional decision not to have an abortion.... Once the mother has made the choice to have a child, she must accept the consequences of that choice. One of the consequences of having children is that it creates certain duties and obligations to that child. If a woman does not fulfill those obligations, then the state must step in to prevent harm to the child. As one judge aptly pointed out, there is simply 'no reason to treat a child in utero any differently from a child ex utero where the mother has decided not to destroy the fetus or where the time allowed for such destruction is past.' 48 Drake L.Rev. at 762–763 (Internal citation omitted).

In numerous cases dating since 1960, we have held that a viable fetus is a person. *Hall v. Murphy*, 236 S.C. 257, 113 S.E.2d 790 (1960); *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42 (1964); *State v. Horne*, 282 S.C. 444, 319 S.E.2d 703 (1984). In *Whitner, supra*, we reiterated the fact that a viable fetus is a child within the meaning of the child abuse and endangerment statute. Most recently, we held that a viable fetus is both "person" and "child" as used in statutory aggravating circumstances which provide for death penalty eligibility. *State v. Ard*, 332 S.C. 370, 505 S.E.2d 328 (1998).

 A penal statute offends due process only when it fails to give fair notice of the conduct it proscribes. *State v. Edwards*, 302 S.C. 492, 397 S.E.2d 88 (1990); *State v. Smith*, 275 S.C. 164, 268 S.E.2d 276 (1980). The statute must give sufficient notice to enable a reasonable person to comprehend what is prohibited. *State v. Crenshaw*, 274 S.C. 475, 266 S.E.2d 61, *cert. denied*, 449 U.S. 883, 101 S.Ct. 236, 66 L.Ed.2d 108 (1980). In *Whitner*, we rejected the claim that application of the child endangerment and neglect statute did not give the defendant fair notice of the conduct proscribed, stating:

> The statute forbids any person having legal custody of a child from refusing or neglecting to provide proper care and attention to the child so that the life, health, or comfort of the child is endangered or is likely to be endangered. As we have found above, the plain meaning of "child" as used in this statute includes a viable fetus. Furthermore, it is common knowledge that use of cocaine during pregnancy can harm the viable unborn child. Given these facts, we do not see how Whitner can claim she lacked fair notice that her behavior constituted child endangerment as proscribed in section 20-7-50. Whitner had all the notice the Constitution requires.

328 S.C. at 16, 492 S.E.2d at 784–785.

 Similarly, a person is guilty of homicide by child abuse if the person causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life. Under *Whitner*, taking cocaine while pregnant constitutes neglect and, as discussed in Issue 1 above, it was a jury question whether McKnight acted with

extreme indifference to human life. Given the ample authority in this state finding a viable fetus to be a person, we find McKnight was on notice that her conduct in ingesting cocaine would be proscribed.[6]

## 4. RIGHT TO PRIVACY

McKnight next asserts application of the homicide by child abuse statute to women for conduct during pregnancy violates the constitutional rights of privacy and autonomy.

■ McKnight asserts several policy reasons why women should not be placed in the position of fearing prosecution for conduct engaged in while pregnant (e.g., choosing abortion over pregnancy, foregoing medical care, etc.). While she raises a number of legitimate concerns, she is in reality attempting to assert the privacy rights of other pregnant women, something she does not have standing to do. *Curtis v. State, supra* (one cannot obtain a decision as to the invalidity of an act on the ground that it impairs the rights of others).

■ As to her own right to privacy, this Court specifically rejected the claim that prosecution for abuse and neglect of a viable fetus due to the mother's ingestion of cocaine violates any fundamental right. *Whitner, supra.* In *Whitner* we stated,

It strains belief for Whitner to argue that using crack cocaine during pregnancy is encompassed within the constitutionally recognized right of privacy. Use of crack cocaine is illegal, period. No one here argues that laws criminalizing the use of crack cocaine are themselves unconstitutional. If the State wishes to impose additional criminal penalties on pregnant women who engage in this already illegal conduct because of the effect the conduct has on the viable

---

6. McKnight also asserts the statute as interpreted to apply to pregnant women is void for vagueness as it is unclear what conduct by a pregnant woman is likely to result in the stillbirth of her fetus. As recently recognized by the Court in *Curtis v. State*, 345 S.C. 557, 549 S.E.2d 591 (2001), however, one to whose conduct the law clearly applies does not have standing to challenge it for vagueness. Given that the statute clearly applies to a stillbirth caused by ingestion of cocaine, McKnight lacks standing to raise a void for vagueness contention.

fetus, it may do so. We do not see how the fact of pregnancy elevates the use of crack cocaine to the lofty status of a fundamental right.

328 S.C. at 18, 492 S.E.2d at 786. Accordingly, we find McKnight's right of privacy was not violated.

## 5. EIGHTH AMENDMENT

 McKnight next asserts the trial court erred in refusing to dismiss the indictment on Eighth Amendment grounds. We disagree.

 The cruel and unusual punishment clause requires the duration of a sentence not be grossly out of proportion with the severity of the crime. *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Pursuant to *Solem*, this Court reviews three factors in assessing proportionality: (1) the gravity of the offense compared to the harshness of the penalty; (2) sentences imposed on other criminals in the same jurisdiction; and (3) sentences for the same crime in other jurisdictions. *State v. Jones*, 344 S.C. 48, 543 S.E.2d 541 (2001).[7]

Here, the gravity of the offense is severe; McKnight is charged with homicide.[8] The sentence for homicide by child abuse under S.C.Code Ann. § 16-3-85(C)(1) is twenty years to life, and McKnight received a twenty year sentence, suspended upon service of twelve years. The penalty is no harsher than that imposed upon any other individual charged with murder. *See* S.C.Code Ann. § 16-3-20 (persons guilty of murder must be punished by death, life imprisonment, or mandatory minimum term of thirty years); *Simmons v. State*, 264 S.C. 417, 215 S.E.2d 883 (1975) (holding sentence of life

---

7. It is questionable, in light of the United States Supreme Court's opinion in *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), whether the stringent three-factor *Solem* inquiry remains mandated in "cruel and unusual punishment" cases. *See State v. Brannon*, 341 S.C. 271, 533 S.E.2d 345 (Ct.App.2000) (finding 3 prong inquiry no longer applicable and requiring only a threshold comparison of the gravity of the offenses against the severity of the sentence).

8. To the extent McKnight attempts to compare the gravity of the offense with criminal abortion, she is, in reality, raising an equal protection claim. *See* Issue 6 below.

imprisonment resulting from a wrongful killing caused by the use of an automobile is not cruel and unusual punishment).

Finally, although other states have not defined a viable fetus as a child for purposes of criminal prosecution of a pregnant mother, other states impose severe sentences on those who are guilty of the murder or neglect of a child. *See e.g.*, Az. St. § 13–604.1(B)(person convicted of attempted murder of a minor under twelve years of age may be sentenced to life imprisonment); Or. St. Ann. § 163.115(1)(c)(when a person by abuse, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age, it is murder requiring mandatory life sentence); W.Va.Code § 61–8D–2 (parent who maliciously and intentionally fails to supply child with necessary food, clothing, shelter or medical care resulting in child's death is guilty of murder in first degree and penalized accordingly). We find no Eighth Amendment violation.

## 6. EQUAL PROTECTION

McKnight next asserts that application of the homicide by child abuse statute to her violates equal protection inasmuch as a person charged under the criminal abortion statute is subjected to a maximum of two years imprisonment, while one prosecuted under the homicide by child abuse statute is subjected to the possibility of life imprisonment.

This issue is procedurally barred from review. While McKnight did file a pre-trial motion to dismiss based upon equal protection, and renewed that motion at trial, her arguments at trial were premised upon the statute's applicability only to women and its disparate impact upon women. At no time did she raise the contention she now raises concerning the disproportionality of the criminal abortion statute. Accordingly, this argument is unpreserved and we therefore decline to address it. *State v. Dickman*, 341 S.C. 293, 534 S.E.2d 268 (2000) (party may not argue one ground at trial and an alternate ground on appeal); *In re McCracken*, 346 S.C. 87, 551 S.E.2d 235 (2001) (constitutional claim must be raised and ruled upon to be preserved for appellate review).

## 7. SUPRESSION OF URINE SAMPLE

Finally, McKnight asserts the trial court erred in refusing to suppress the results of a urine sample taken at the hospital after the stillbirth, contending the sample was taken in violation of her fourth amendment rights. We disagree.

Pursuant to a Conway Hospital Protocol for the Management of Drug Abuse during Pregnancy, a medical urine drug screening **may** be ordered at the discretion of the attending physician if an obstetrical patient meets one of several criteria, including lack of prenatal care or unexplained fetal demise. If such a drug screening test turns up positive from the hospital's lab, then hospital personnel are to request consent from the patient for forensic (medical-legal) testing. If consent is obtained, the sample is sent to the hospital's reference lab and the nursery is notified. The Department of Social Services is to be notified of positive medical urine drug screening and the criteria causing the drug screen to be done, and whether forensic testing is being done on the mother or newborn. The protocol states that As mandated by law, it is the obligation of every medical facility, as well as each individual, to report to DSS any suspected abuse or neglect involving an unborn, yet viable, fetus or newborn child. The hospital also has a Chain of Custody form and procedure for handling forensic samples.

Here, an initial drug screen was ordered by the obstetrician, Dr. Niles, due to McKnight's lack of prenatal care. When the initial screen tested positive for cocaine, Mary McBride, a labor and delivery nurse, was instructed to obtain a forensic urine sample from McKnight. Before doing so, McBride read an Informed Consent to Drug Testing form to McKnight. McBride testified she read the form to McKnight, and advised her that it could be used for legal purposes; she did not, however, specifically advise McKnight that police would possibly arrest her. The form states that McKnight acknowledges she has testified positive for cocaine, and is being requested to give consent for a medical-legal (forensic) test which will confirm or deny the initial report. The form further states that It has been explained to me that I may refuse consent for this test. It has been explained to me that this test may be used for legal purposes. McKnight signed the form indicating

her consent. The second sample also tested positive for cocaine.

McKnight asserts the forensic/legal sample was taken in violation of her fourth amendment rights, contrary to the United States Supreme Court's opinion in *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). We disagree. The issue in *Ferguson*, as framed by the Court, was as follows:

> In this case, we must decide whether a state hospital's performance of a diagnostic test to obtain evidence of a patient's criminal conduct for law enforcement purposes is an unreasonable search if the patient has not consented to the procedure. More narrowly, the question is whether the interest in using the threat of criminal sanctions to deter pregnant women from using cocaine can justify a departure from the general rule that an official nonconsensual search is unconstitutional if not authorized by a valid warrant.

532 U.S. at 69–70, 121 S.Ct. 1281.

In *Ferguson*, staff members of MUSC developed a written policy, in conjunction with the solicitor and police, for obtaining evidence to prosecute women who bore children who tested positive for drugs at birth. These procedures provided a plan to identify and test pregnant patients suspected of drug use **without their knowledge or consent.** The plan (1) required that a chain of custody be followed when obtaining and testing patients' urine samples, (2) contained police procedures and criteria for arresting patients who tested positive, and (3) encouraged prosecution for drug offenses and child neglect, and specifically set forth the offenses with which the women could be charged, as well as procedures for police to follow upon arresting the women. *Id.* at 70–73, 121 S.Ct. 1281.

The Supreme Court held MUSC's performance of diagnostic tests to obtain evidence of the women's criminal conduct for law enforcement purposes was an unreasonable search if the patient had not consented to the procedure. *Id.* at 84–85, 121 S.Ct. 1281. The Court held that [g]iven the primary purpose of the Charleston program, which was to use the threat of arrest and prosecution in order to force women into treatment, and given the extensive involvement of law enforcement offi-

cials at every stage, the policy did not fit with the closely guarded special needs category which would justify a warrant-less, non-consensual search. *Id.*

*Ferguson* is distinguishable in several respects. First, there is no evidence that Conway Hospital's policy was in any way developed or implemented in conjunction with police, the solicitor, the Attorney General, or any other law enforcement personnel. Second, unlike the policy at issue in *Ferguson,* Conway Hospital's policy did not require hospital staff to turn drug screening results over to law enforcement personnel. On the contrary, the hospital's protocol merely requires that its department of social work services be notified and that a telephone referral be made to DSS when an assessment reveals suspicion of illegal drug use or reason to believe the unborn or newborn child is at risk. A DSS caseworker is not a law enforcement officer. *State v. Sprouse,* 325 S.C. 275, 478 S.E.2d 871 (Ct.App.1996).

Third, unlike *Ferguson,* Conway Hospital's testing was not done surreptitiously, but was done with McKnight's knowledge and consent. The labor and delivery nurse specifically testi-fied that she obtained a written consent form from McKnight to perform the second urine specimen; the consent form indicated to McKnight that she had the right to refuse the test, and that it could be used for legal purposes.

We find the state sufficiently demonstrated, through the testimony of Nurse McBride, that McKnight consented to the search. The only evidence in the record on this point is the testimony of McBride, who testified that she read the form to McKnight, and told her that the sample could be used for legal purposes. The form which was read to McKnight specifically advised that she may refuse consent, and that the test may be used for legal purposes. This is sufficient evidence upon which to find the consent was voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Wallace,* 269 S.C. 547, 238 S.E.2d 675 (1977) (whether a consent to search was voluntary is a question of fact to be determined from the "totality of the circum-stances)."

■ Finally, even assuming *arguendo* that McKnight did not consent to the urine specimen, and that it was illegally

obtained, we find any error in its admission was harmless. The DSS caseworker testified, without objection, that McKnight told her she knew she was pregnant and that she had been using crack cocaine when she could get it. Further, the defenses' own expert, Dr. Conradi, testified that cocaine was in the baby at some point. Both of the state's expert pathologists testified that the only way for the infant to have the benzoylecgonine present was through cocaine, and that the cocaine had to have come from the mother. Given this evidence, even assuming the urine sample was erroneously admitted, it could not have impacted the jury's verdict. *Arnold v. State*, 309 S.C. 157, 420 S.E.2d 834 (1992), *cert. denied*, 507 U.S. 927, 113 S.Ct. 1302, 122 L.Ed.2d 691 (1993) (error is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained).

McKnight's conviction and sentence are affirmed.

**AFFIRMED.**

TOAL, C.J., and BURNETT, J., concur.

JUSTICE MOORE:

I respectfully dissent. Once again, I must part company with the majority for condoning the prosecution of a pregnant woman under a statute that could not have been intended for such a purpose. Our abortion statute, S.C.Code Ann. § 44–41–80(b) (2002), carries a maximum punishment of two years or a $1,000 fine for the intentional killing of a viable fetus by its mother. In penalizing this conduct, the legislature recognized the unique situation of a feticide by the mother. I do not believe the legislature intended to allow the prosecution of a pregnant woman for homicide by child abuse under S.C.Code Ann. § 16–3–85(A)(1) (Supp.2001) which provides a disproportionately greater punishment of twenty years to life.

As expressed in my dissent in *Whitner v. State*, 328 S.C. 1, 492 S.E.2d 777 (1997),[9] it is for the legislature to determine whether to penalize a pregnant woman's abuse of her own body because of the potential harm to her fetus. It is not the business of this Court to expand the application of a criminal

9. *See also State v. Ard*, 332 S.C. 370, 505 S.E.2d 328 (1998) (Moore, J. dissenting).

statute to conduct not clearly within its ambit. To the contrary, we are constrained to strictly construe penal statutes in the defendant's favor. *State v. Blackmon,* 304 S.C. 270, 403 S.E.2d 660 (1991).

Because I disagree that § 16–3–85 applies in this case, I dissent.

PLEICONES, J., concurs.