687 S.E.2d 70

**The STATE, Respondent,**

**v.**

**Chris Anthony LIVERMAN, Appellant.**

**No. 4635.**

Court of Appeals of South Carolina.

Heard Oct. 7, 2009.

Decided Dec. 4, 2009.

Rehearing Denied Jan. 20, 2010.

Chief Appellate Defender Joseph L. Savitz, III, South Carolina Commission on Indigent Defense Division of Appellate Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Sr., Assistant Attorney General William Edgar Salter, III, Office of the Attorney General, of Columbia, Warren Blair Giese, Fifth Circuit Solicitor's Office, of Columbia, for Respondent.

HUFF, J.

Chris Anthony Liverman was convicted of two counts of murder and was sentenced to two consecutive sentences of life imprisonment. Liverman appeals asserting (1) the trial court erred in failing to conduct an in camera hearing on the reliability of the identification of Liverman by one of the State's witnesses and (2) the trial court erred in allowing one of the State's experts in gang activity and recognition to testify concerning body markings on Liverman indicating Liverman had committed two prior murders. We affirm.

## FACTUAL/PROCEDURAL HISTORY

On the night of August 26, 2004, Brian D. was on the porch outside his home with his friend, Christopher, when several boys came around the corner and asked them if there were any "Slobs" around there.[1] Brian and Christopher responded they had not seen any, and did not know. Brian saw the boys walk off behind the house, at which time he went inside his home and told his step-father, Teddy, that something "didn't look right." Brian stepped back outside and started talking to Christopher. As Brian began to re-enter his home, he heard shooting and ran inside the house. Courtney D., Brian's sister, and Terrence M. were in the front yard at that time. After the shots rang out, Brian heard Christopher say that Courtney and Terrence had been shot.

Teddy testified he and Courtney were inside the house when Brian went outside and started talking to his friend on the porch. Courtney told her father she needed to get

---

1. "Slobs" was used as a disrespectful term for a gang called the Bloods.

something from a friend's house. Brian came inside and told Teddy that something did not look right. Brian stepped back outside, followed by Courtney a few seconds later. Just seconds after that, Brian "jumped in the door" and Teddy heard gunshots. Realizing his daughter had just walked out the door, Teddy went outside to find Courtney was not moving and had blood coming from her head. He glanced to his right and saw Terrence out there too. Twelve year-old Courtney and sixteen year-old Terrence subsequently died from their gunshot wounds.

On the same day, but prior to the shooting of Courtney and Terrence, at least two other incidents occurred on T.S. Martin Drive where Courtney lived. The first situation involved Brady B., who drove his white Ford Escort down this street with Travis W., Travis B., Demetrius B., and Paris A. in the car. The boys in the white Escort had an unfriendly encounter with a male in the neighborhood, and words having gang-related undertones were exchanged.[2] Brady drove away from the situation, and subsequently went to a parking lot at Bethel Bishop Apartments with Paris.

While at Bethel Bishop, Brady and Paris spoke to some of the people outside. Brady testified he, Paris, and Carl Smith, also known as Pooh, were joined by Praylow. Pooh, who was a member of the same gang as Appellant, the Folk Nation Gang, testified he, Paris, and Brady were joined by someone named Sherod,[3] and that they drove back to T.S. Martin looking for a person named Delshawn. Pooh testified Brady and Paris had indicated to the others they had a problem and wanted to go fight.

According to Brady, they turned down T.S. Martin and saw a young girl, about twelve years-old. Brady asked her if she knew the boy they had encountered earlier and the girl cussed at them. They told the girl to go back in her house. They turned around and drove back down the street, parked the car and exited the vehicle. The group walked up the street, but everyone in the neighborhood began closing their doors.

---

**2.** Brady testified he later determined the person confronting them that day was "Tyrone."

**3.** Sherod is apparently Sherod Praylow.

There was no one outside, so they walked back to the car and drove away. After leaving T.S. Martin this second time, Brady stated he did not return to the location again, and denied being there during the shooting. He further testified, to his knowledge, no one in his group had a gun during this encounter.

Pooh testified when they exited the car at T.S. Martin, he was wearing a black bandana around his head, signifying the Folk Nation Gang. As they were looking for Delshawn, a female called out Pooh's name as they crossed the street.[4] The others began walking around, but Pooh called them back, realizing that if they jumped someone at that time he would be the one caught since the female recognized him.[5] They got back in the car, and Brady dropped Pooh and Sherod off at Bethel Bishop.

According to Pooh, he first saw Appellant that night coming out of Bayberry Apartments, located right behind Bethel Bishop. Appellant was accompanied by Pooh's deaf friend, Goo, and two other individuals Pooh did not know. Pooh explained to appellant what had happened at T.S. Martin and appellant told Pooh someone from T.S. Martin "had run him out there a couple of days before." Appellant then showed Pooh three or four .22 caliber bullets and said he "might go on a lick." Appellant also told Pooh he had just obtained a .22 caliber gun. Appellant kept telling Pooh he was about to go back to T.S. Martin, but Pooh asked appellant not to, fearing that if anything occurred he would be the person suspected, as the female had called out his name earlier. Appellant then told Pooh he was going to walk Goo home and probably was not "going to go up there."

Diego T., who was seventeen years-old at the time of trial, testified regarding his role in the incidents that occurred that night. Diego testified he ran into appellant, who went by the name Baby Jesus, at Bethel Bishop Apartments as it started to get dark. Appellant told Diego he had to go handle something at T.S. Martin, and asked Diego to go with him.

---

4. Pooh later identified this female as Precious, a person with whom he had worked in the past.

5. Pooh stated they did not have any guns with them, but someone in the car did have some brass knuckles.

Diego agreed, and as they walked they met up with Ty, Goo, and Little Chris. After appellant had a conversation with these three, they also agreed to accompany him to T.S. Martin. As they walked through Bethel Bishop they saw Pooh, and appellant had a conversation with Pooh. Pooh told them to be careful "because they had pulled some guns on some Slobs."

It was nighttime and dark when the five of them, appellant, Diego, Ty, Goo, and Little Chris, walked over to T.S. Martin. Appellant put a black "flag," or bandana, around his neck, indicating he was representing his set, the Folk Nation Gang. As they arrived there, Little Chris asked a boy sitting on a porch if he was a "Slob." The boy responded that there was "no gang banging" around there. The boy then got on the phone, at which time Diego told the rest of them it was time to go, as he believed the boy was calling the police or other boys to come over there. Appellant responded that he wanted him to call his boys. At that point, Diego saw appellant pull out a .22 rifle. When appellant pulled out the gun, he was across the street from the house where they saw the boy on the porch. Diego told them it was time to leave and he started to back away. He then saw Goo with a "shotgun at his hand" and appellant sign to Goo to shoot at the house. After appellant pointed the rifle at the house, Ty, Goo and Little Chris started running away and Diego heard gunshots. When he looked back, he saw appellant throw down the rifle and pick up the shotgun and point it. However, he did not hear any more shots. Appellant eventually caught up with them, and Diego saw appellant wrap the guns and place them under a log.[6] Some weeks thereafter, appellant called Diego and asked him to get the guns from under the log and move them. However, Diego did not do so because he knew someone else had already moved them. The only person Diego observed pointing the .22 rifle or shooting that night was appellant. Diego described appellant as wearing two shirts, one black and the other white, along with long, black Dickey shorts and a pair of black and white shoes on that night.

---

6. In a statement to Investigator Gray, Diego informed him that after appellant caught up with them, he took off a shirt, wrapped the guns in it, and hid it under a log near the railroad tracks.

Shante B., who was also a member of the Folk Nation Gang, testified to her encounter that night with appellant and Pooh. Shante was standing in front of a building at Bethel Bishop when appellant told her he was going to T.S. Martin to "ride with some Slobs." Pooh told appellant not to go over there. Appellant left the area with Goo, Mirage and Diego. A little while later, Shante saw appellant running back to Bethel Bishop from the woods in the direction of T.S. Martin "at full speed." Shante overheard appellant telling one of his friends he had just left T.S. Martin, that he was "spraying" when he was shooting, and that two little kids were shot. Appellant stated he had done this because earlier in the evening "they had got in something with some Bloods." Appellant then ran away from Bethel Bishop.

After the second incident, where the boys drove back to T.S. Martin in Brady's car looking to fight the individual they previously encountered, the police were called. Officer Reynolds was dispatched to T.S. Martin at 9:11 p.m. on August 26, 2004, in regard to a civil disturbance. After being informed that some irate black males in a small white vehicle had come to the area looking for someone named "Delshawn," Officer Reynolds, along with another policeman who responded to the call, left the neighborhood to find Delshawn and see if he could identify the people involved. The officers spoke with Delshawn for ten to fifteen minutes, and upon leaving received a call at 9:44 regarding another disturbance on T.S. Martin. The dispatch then immediately changed to a "shots fired" call at the location. Officer Reynolds testified he was able to get back to T.S. Martin in about three or four minutes, and when he arrived he observed two individuals on the ground and a lot of people in the yard. Those standing there began yelling to him that the suspects had run behind the house, in the direction of Beltline.

Sergeant Auld also responded to the 9:44 p.m. shots fired dispatch, and heard over the radio that the subjects were running toward the railroad track. Sergeant Auld and Officer Whittle proceeded to the bottom of a cut, went over some railroad tracks, and as they reached the top of a mound, they heard crashing noises in the woods. Using a flashlight, they spotted appellant running out of the woods and commanded him to stop. Other individuals who could be heard in the

woods took off in another direction. The officers placed appellant in handcuffs and detained him in Officer Whittle's vehicle. Investigator Gray then brought a witness to the site, and Officer Whittle removed appellant from his car and used his flashlight to shine on appellant for the witness to observe him. Officer Whittle described appellant as wearing a pair of gray shorts over a pair of dark blue basketball shorts, a white t-shirt, and black and white tennis shoes that night.

After arriving at the scene of the incident, Investigator Gray interviewed witness Tyrone S., who informed Gray he had observed the shooting. Tyrone indicated there was only one shooter, and identified the person by his nickname. Upon hearing a possible suspect had been detained, Gray drove Tyrone to the location of the detention, pulled about twenty feet behind the car holding the suspect, and turned on his high beam lights. Officer Whittle removed the suspect from his car and had the person face Investigator Gray's vehicle for a few minutes. Based upon the identification process, Gray requested Whittle transport appellant to police headquarters. Thereafter, Gray interviewed appellant. When told he had been identified as being involved in a shooting at T.S. Martin, appellant initially denied having been there. When told he had been placed at T.S. Martin at the time of the shooting, appellant then stated he had been at T.S. Martin "earlier" and "one of the dark skinned dudes" was shooting at a house. Appellant denied that he shot a gun that night. Approximately twelve hours later, and after a gunshot residue test had been performed on appellant,[7] appellant gave another statement. This time he stated he had been firing a gun on the night in question, but claimed it was a .32 caliber gun, he only had two bullets, and that he shot at a top window of a house with a round hole like an attic, situated on the corner. Authorities were unable to discover any bullet holes in the only home in the area with an attic vent, or any damage to any homes in the area other than Courtney's home.

Tyrone S. testified regarding his witness of the shooting and the events surrounding it. Tyrone saw appellant at an apart-

---

7. Appellant's gunshot residue test ultimately did not detect sufficient residue to conclusively determine whether appellant had fired a weapon that night, and thus the test "came back negative."

ment complex around 3:00 in the afternoon on August 26, 2004. Tyrone was with Delshawn, a member of the Bloods Gang. Tyrone did not speak with appellant, but he observed a conversation take place between Delshawn and appellant that he did not hear. Tyrone and Delshawn then went back to T.S. Martin where Tyrone lived. A little after 9:00 that evening, Delshawn, who did not live on T.S. Martin, left Tyrone's home. After his departure, Tyrone received a call from Courtney wherein she relayed that some boys had asked her where the "Slobs" stayed. Tyrone went outside to talk to Courtney. He observed some boys exit a car onto T.S. Martin. Someone from the car had yelled, "There goes Delshawn," referring to Tyrone. One of the boys, who had braids, was wearing a light t-shirt and a black bandana covering half of his face. This person, who was two houses up as Tyrone stood on his porch, pointed a gun at Tyrone and said he was going to kill him. He then stated, "That ain't Delshawn," and turned and walked away, at which point Tyrone ran into his house, and someone in his house called the police. After telling the officers the boys were looking for Delshawn, the police left to find Delshawn themselves. At the time, Tyrone did not know who the person was with the bandana, but he later told the police he thought it was appellant. Tyrone testified this same white vehicle had come into their neighborhood earlier that day. At that time, they rode down the street and started saying, "Come down here," speaking to Delshawn. As they were riding past, Delshawn and Tyrone were throwing up gang signs to them.

After the police left to look for Delshawn, Tyrone was sitting on the porch with his two female cousins and one of their friends when they saw five males walking up from the front of the neighborhood. Appellant was walking in the front of the group, and he was the only one who was not wearing a bandana around his face. Tyrone and the others ran into the house and cut off the indoor house lights when they saw the boys. Tyrone ran upstairs to a window. A motion detector light on the house where the boys were standing, as well as a street light located a little bit down the street, provided light. From his position in the upstairs window, Tyrone saw appellant get a rifle and then provide a revolver to another person. Appellant then knelt down, aimed, started shooting, stood up,

and then continued shooting. After the first shot was fired, all the other boys ran away. Tyrone heard multiple shots, and someone in his house called the police to return to T.S. Martin. Appellant was in the street when he was shooting. Appellant tried to shoot again, but was unsuccessful. He then turned around and ran away in the same direction as the other boys. Tyrone estimated he watched from the upstairs window for a period of four to five minutes.

Tyrone spoke with Investigator Gray at the scene and told him what he had observed and identified the shooter by his nickname. Gray then transported Tyrone to another location about four or five miles away, where Tyrone identified appellant as the shooter.

The State also presented testimony from two individuals qualified as experts in the field of gang activity and/or gang recognition. Both experts testified generally regarding several gangs with a presence in South Carolina, as well as to the meaning of certain tattoos and brands on the body of appellant, affiliating appellant with the Folk Nation Gang and possibly indicating he had "bodies" attributed to him. Additionally, the experts testified the Bloods and the Folk Nation did not "get along," and are considered rival groups.

Precious D. also testified to her observation of a small white car on T.S. Martin approximately thirty minutes prior to the shooting incident. According to Precious, the car stopped in the middle of the road and she saw one individual exit the vehicle. This person started arguing with someone at one of the houses and lifted his shirt to show he had a gun tucked in his pants. When he started talking, Precious recognized the person as Pooh, whom she had worked with in the past. Precious called him "Pooh," and told him "you need to go somewhere with that mess." After calling out his name, the people from the car left within about two or three minutes. Although Pooh had a bandana on his face, she recognized him by his voice and the way he walked.

The defense argued to the jury that Pooh and Diego had fabricated appellant's involvement in order to make him the "fall guy" and cover for one another. Counsel also maintained Tyrone was mistaken about his identity of appellant as the person who pointed a gun at him in the second incident, just

prior to the shooting, and because of this mistake, his identification of appellant as the shooter could not be trusted. The matter was submitted to the jury and appellant was found guilty of the murders of Courtney and Terrence. This appeal follows.

## ISSUES

1. Whether the trial judge committed reversible error by refusing to conduct an in camera hearing pursuant to *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and Rule 104(c), SCRE, on the reliability of Tyrone's identification of appellant as the shooter, especially in light of the fact Tyrone had incorrectly identified appellant as a participant in an earlier incident shortly before the shooting, and his identification of appellant as the triggerman was the product of an inherently suggestive show-up conducted by the police after appellant was arrested.

2. Whether the trial judge committed reversible error by allowing the State's purported gang expert to testify that one of appellant's body markings meant that he had committed two prior murders, as this evidence placed appellant's character at issue in violation of Rules 403 and 404, SCRE.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only. We are bound by the trial court's factual findings unless they are clearly erroneous. This same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases." *State v. Wilson*, 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001) (citations omitted). The admission or exclusion of evidence is left to the sound discretion of the trial court, and the court's decision will not be reversed absent an abuse of discretion. *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). An abuse of discretion occurs when the decision of the trial court is based upon an error of law or upon factual findings that are without evidentiary support. *Id.* A court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion or the commission of legal error which

results in prejudice to the defendant. *State v. King*, 367 S.C. 131, 136, 623 S.E.2d 865, 867 (Ct.App.2005).

## LAW/ANALYSIS

### I. Tyrone's Identification

■ In a pretrial motion two months before the trial, the trial judge indicated he was ready to proceed on the *Neil v. Biggers* hearing. Before calling any witnesses, the State noted the constitutional safeguards in place under *Neil v. Biggers* were designed to avert the dangers of mistaken identity and applied in situations involving strangers. The State argued, pursuant to *State v. McLeod*, 260 S.C. 445, 196 S.E.2d 645 (1973), the trial judge did not need to conduct a basic review of the totality of the circumstances and the suggestiveness of the show-up where the witness knows, independently from the incident, the person he or she is identifying. Accordingly, the State maintained that *Neil v. Biggers* did not apply in this situation. Defense counsel countered that this case was distinguishable from *McLeod* inasmuch as here, the witness viewed the incident from some distance away and, further, there was not a sufficient existing relationship between the witness and the person identified.

The trial judge determined the State should put up evidence on Tyrone's prior relationship or knowledge and he would then decide whether there needed to be further showing other than the relationship between the two. Tyrone testified in an in camera hearing that he was in a house on T.S. Martin on August 26, 2004, when he observed the shooting from an upstairs window. Tyrone made an in-court identification of appellant as the shooter. Tyrone further testified he had known appellant since he was elementary school age,[8] had known him for a period of approximately seven years, that appellant used to visit Goo's home, an apartment next to where Tyrone's aunt lived, that appellant and Goo were friends of his at the time, appellant used to talk to Goo for him because Goo was deaf, and the three of them "hung out" together for about a four day period. Since elementary school, Tyrone had seen appellant twice in 2003 at Mc-

---

8. Tyrone and appellant did not attend the same school.

Donald's, where appellant worked, and he also saw appellant earlier on the day of the shooting, from about two houses away, at a housing complex where he observed appellant talking to Delshawn.

Defense counsel argued the State failed to make a sufficient showing there was any kind of preexisting relationship between Tyrone and appellant and therefore there was no reliable basis for Tyrone's identification of appellant. The trial judge found the facts to be close to *McLeod*, but before ruling determined the State should continue the examination to show exactly what occurred at the time the identification was made so he could look at the totality of the circumstances. Thereafter, Tyrone testified he observed appellant shooting from "right across the street." He gave Investigator Gray his statement shortly after the shooting identifying appellant as the shooter by his nickname. He was taken to another location about four blocks away and he sat in Investigator Gray's vehicle and observed appellant standing on the side of a police car wearing the same clothes he was wearing at the time of the shooting. It was dark outside at the time he saw appellant, and he remained inside the police car approximately three to six feet away from appellant. At the time of the shooting, there were no lights on in the upstairs room where he stood, but there was a street light on behind the shooter and a light on the side of a house.

Following Tyrone's in camera testimony, defense counsel objected "to the lack of allowing a full *Neil v. Biggers* hearing." Counsel argued this matter did not fall within *McLeod* as there was an insufficient showing of "any real meaningful preexisting relationship between" Tyrone and appellant. Counsel therefore asked for "a full *Neil v. Biggers* hearing on this issue." The trial judge noted *McLeod* indicated constitutional and procedural safeguards under *Neil v. Biggers* were not intended to apply where a victim knows an accused, and *McLeod* does not talk about the degree of knowledge or indicate there must be an intimate relationship. He found, based on the evidence presented, that a relationship, or at least knowledge existed, and whether that knowledge was sufficient went to the weight of the testimony rather than the admissibility of it. The trial judge additionally determined there was sufficient showing by the State, under the totality of

circumstances, to make an identification, even considering the suggestiveness of show-ups, as the witness testified he knew the defendant since elementary school, he had seen him at McDonald's, he had seen him at the apartment complex on the day of the shooting, he knew him by nickname, and he identified him by nickname prior to being taken to the location of the identification. The trial judge therefore determined the identification testimony was admissible, and the defense could argue about its weight to the jury.

At the commencement of the trial two months later, defense counsel asked the trial judge to revisit the *Neil v. Biggers* issue previously raised. Counsel noted that some information came out in an unrelated hearing on this case and, at the time of the judge's initial ruling on this matter, it had not been known that Tyrone had inaccurately identified appellant as the person who had pointed a gun at Tyrone in the incident prior to the shooting incident. Counsel therefore argued that the judge never had an opportunity to consider this fact and appellant was entitled to a full *Neil v. Biggers* hearing that would allow this other information to be considered. Counsel further asserted a full in camera hearing was required by Rule 104, SCRE. The State continued to maintain that it had established Tyrone had prior knowledge of the defendant and counsel's arguments went to the weight of the evidence and not admissibility. The trial judge stated he was still of the opinion a sufficient showing had been made by the State to establish a prior knowledge or relationship between the witness and the defendant and found, under *McLeod*, that a full *Neil v. Biggers* hearing was not required. At the close of the State's case, counsel renewed the defense objection to the denial of a full *Neil v. Biggers* hearing. The trial judge overruled the objection.

On appeal, appellant contends the trial judge erred in refusing to conduct an in camera hearing regarding the reliability of Tyrone's identification of appellant as the shooter. He argues that the shooting occurred in a dark neighborhood with various people moving about, and Tyrone testified he observed the shooter from an upstairs window. Appellant asserts there were substantial problems with the reliability of Tyrone's identification too because, although Tyrone claimed to know appellant since elementary school, he was unaware of

appellant's real name until after he identified appellant to police. Additionally, appellant notes Tyrone incorrectly identified appellant as the person who had threatened to kill him a short time before the shooting. Appellant contends the fact that a witness knew the defendant prior to the commission of the crime is only another factor to consider in a *Neil v. Biggers* analysis when, as here, the witness had incorrectly identified the defendant on a previous matter and subsequently participates in an inherently suggestive show-up. Appellant further maintains, given the importance of Tyrone's testimony identifying him as the shooter, the failure to hold a full *Neil v. Biggers* hearing could not have been harmless error. We disagree.[9]

█ When identification of a defendant is at issue, the general rule is that a trial court must hold an in camera hearing when the State offers a witness whose testimony identifies the defendant as the person who committed the crime, and the defendant challenges the in-court identification as being tainted by a previous, illegal identification or confrontation. *State v. Miller*, 359 S.C. 589, 596, 598 S.E.2d 297, 301 (Ct.App.2004), *aff'd*, 367 S.C. 329, 626 S.E.2d 328 (2006). Additionally, our courts have noted Rule 104(c), SCRE,[10] "unambiguously mandates hearings on the admissibility of out of court identifications of the accused shall in all cases be held outside the presence of the jury," and while the adoption of Rule 104 did not abrogate the viability of the rulings in the pre-Rules of Evidence cases, an in camera hearing required by Rule 104(c) allows a defendant to question a witness more

9. We note the State contends, because defense counsel failed to object when Tyrone's identification testimony was presented during the trial and the pretrial rulings on the matter were not made immediately prior to Tyrone's trial testimony, the issue is not preserved for review. However, trial counsel did not simply object to the admission of the identification evidence in the pretrial motions, but specifically argued the defense was entitled to a "full *Neil v. Biggers* hearing" and objected to the trial judge's failure to grant appellant a more extensive hearing on the matter. It is from the denial of this extensive hearing that appellant appeals. The matter was repeatedly argued and ruled on by the trial court, and we find it adequately preserved for our review.

10. Rule 104(c), SCRE provides, in part, that "[h]earings on the admissibility of . . . pretrial identifications of an accused shall in all cases be conducted out of the hearing of the jury."

stringently regarding possible misidentification or bias outside the presence of the jury. *State v. Cheatham*, 349 S.C. 101, 117, 561 S.E.2d 618, 627 (Ct.App.2002).

In *State v. McLeod*, 260 S.C. 445, 196 S.E.2d 645 (1973), our supreme court addressed the issue of a whether a lone confrontation was unfair and untrustworthy where the facts showed the victim knew the accused. The facts in *McLeod* indicate the victim struggled with her assailant and exclaimed, "oh, you Hattie's boy," causing the assailant to flee. The victim went to another woman's house after the attack and said simply, "Hattie's boy." The morning after the incident, the defendant was arrested and taken to the victim's home. Though the victim did not know her assailant's name, she identified the person arrested as the one who assaulted her. The victim testified at trial she recognized her assailant as "Hattie's boy," and made an in-court identification of her assailant. *Id.* at 447, 196 S.E.2d at 645. It was "apparent from the record [victim] knew the defendant," "[s]he had seen him many times at a neighborhood store near their home; she knew the defendant's mother and knew him to be her son." *Id.* at 448, 196 S.E.2d at 645. On appeal, McLeod challenged the fairness of the pre-trial identification procedure used by the police. *Id.* at 448, 196 S.E.2d at 645–46. The court held the rulings in decisions which attempted to avert the danger of mistaken identity by establishing mandatory constitutional and procedural safeguards were designed for application where the accused and victim are strangers to each other, and were "never intended to apply where the victim new the accused." Thus, the constitutional and procedural safeguards McLeod claimed were necessary simply did not apply to the facts of his case. *Id.* at 448, 196 S.E.2d at 646.

In the more recent case of *In re Robert D.*, 340 S.C. 12, 530 S.E.2d 137 (Ct.App.2000), this court held the family court did not err in failing to hold an identification hearing pursuant to *Neil v. Biggers*, as the hearing was not necessary because the victim knew the defendant. *Id.* at 17–18, 530 S.E.2d at 140–41. The record reflected the victim knew Robert D. by his first name, recognized him as a friend of two of her classmates, and remembered he watched a couple of films with her class. The court cited *McLeod*, noting the rules regarding out-of-court identifications were "designed for application

where the accused and the victim are strangers to each other; they were never intended to apply where the victim knew the accused." *Id.* at 18, 530 S.E.2d at 141. Thus, the constitutional and procedural safeguards, which McLeod claimed were necessary, simply did not apply under the facts of the case. *Id.*

We find *McLeod* and *In re Robert D.* to be controlling, and that there was sufficient evidence presented of Tyrone's prior knowledge of appellant such that a *Neil v. Biggers* hearing was not required. Here, the witness knew appellant by his nickname, had known him for a number of years, and specifically testified to having seen appellant on several occasions over the years, including having seen him earlier in the day on the date of the shooting. Additionally, while the defense presented evidence Tyrone mistakenly identified appellant as the person who pointed a gun at him and threatened him in one of the prior incidents, we agree such argument goes to the weight of the evidence.[11]

## II. Meaning of Body Markings

In the pretrial hearing two months prior to appellant's trial, the State indicated its intention to present evidence regarding tattoos on appellant's body. Defense counsel objected, asserting no specific meaning could be attributed to the tattoos, the State was attempting to admit the evidence so the jury would infer the tattoos represented the death of the two children, that the tattoo evidence was grossly and unduly prejudicial and that it was irrelevant. Counsel further argued the State intended to bring out testimony that he received the tattoos while in prison, which was improper character propensity evidence. Counsel asked the court for an in camera hearing on the matter. When the case resumed two months later, counsel sought to exclude the State's gang expert testimony on the meaning of two teardrop tattoos on appellant's body, arguing the State could not lay a proper foundation to the meaning, and testimony from a corrections officer regarding

---

11. We note that Tyrone did not identify the appellant as the person who pointed a gun in his face in the earlier incident until *after* the shooting. It is more likely that any mistaken identity from the earlier incident was the result of his identification of appellant as the shooter in the latter event.

when appellant received the tattoos would allow the State to impermissibly remark on appellant's prior criminal record. The trial judge determined the evidence was admissible as long as the State laid a proper foundation.

Prior to the State calling its gang expert witnesses, the defense renewed its objection to any testimony regarding the purported meaning of "any tattoos," asserting such testimony would be cumulative and unduly prejudicial, and that the State would be unable to provide a foundation for the meaning of the tattoos. Thereafter, the State presented the testimony of Investigator O'Cain, who was qualified as an expert in gang activity and recognition, and Officer Mahoney, who was qualified as an expert in the field of gang activity.

O'Cain testified to various tattoos and brandings he observed on appellant's body, including some indicating appellant's affiliation with the Folk Nation Gang and a "set" of the Folk Nation Gang. O'Cain further testified that a branded pitchfork on appellant's back appeared to have two hash marks on the right side of the pitchfork which could signify appellant's rank. When asked what his expert opinion was as to appellant's rank as denoted by the hash marks, O'Cain stated, from what he had been told "from the streets and interviews," appellant is now "a set King, strike two," and "to get the strike series of that rank, you have to have bodies attributed to you." Counsel objected to this testimony and asked for a mistrial arguing the evidence was without support, it was inflammatory, and O'Cain was improperly relying on hearsay evidence to support his opinion. The trial court overruled the objection, noting reliance on hearsay by the expert was proper under Rule 703, SCRE.[12] O'Cain continued this line of testimony, stating the hash marks represent a rank structure and that it could represent bodies attributed to appellant. When asked what he meant by "bodies," O'Cain responded, "That they have committed some sort of act or murder where bodies—dead people." O'Cain also testified in

---

12. Rule 703, SCRE provides as follows: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

regard to two teardrops above appellant's right eye, one of which was filled in and the other one which was open. O'Cain stated the open tear drop could mean a fellow gang member or relative died, or that an innocent person was killed by mistake, while the filled in teardrop is supposed to represent a retribution, where someone died and that person is responsible for that killing.

Mahoney likewise testified to his observation of various tattoos and brandings on appellant's body. In regard to the pitchfork brand on appellant's back, Mahoney testified the hash marks could mean a lot of things, including "it could mean bodies." He testified it could also mean robbing someone or other things, but "it would be something he did on behalf of the gang," and could include murder. As for the teardrops, Mahoney opined that the open teardrop could represent a lost soldier or someone who was innocent, while "the closed teardrop is a body." The open teardrop could be for a fellow gang member or an innocent person taken out by mistake, and the closed teardrop would represent "a body," indicating the person is a gang member who "took somebody out."

After the State rested, appellant renewed his objection "to any gang expert testimony, especially any references to the tattoos." He argued the State introduced inadmissible character propensity evidence that was irrelevant to the identity of the perpetrator of the crime and was unduly prejudicial. Appellant further objected to the expert testimony as it was based on hearsay. The trial judge overruled the objection.

The defense presented its own expert in the field of gang identification, Robert Walker, who also observed appellant's tattoos and agreed appellant's tattoos reflected his affiliation with the Folk Nation Gang. As to the hash or "slash" marks, Walker testified he had heard they signify rank, but the marks were new to him and he really had no knowledge about the meaning. He had not heard it meant there were bodies attached to it. In regard to the teardrops, Walker explained there were many meanings that could be attributed to them, including having killed someone or having served time, but there was no way to say it had a specific meaning.

On appeal, appellant contends the trial judge erred in allowing Investigator O'Cain to testify the hash marks on appellant's back indicated he had bodies attributed to him, as this evidence placed his character at issue in violation of Rules 403 and 404(b), SCRE.[13] He argues this testimony, in violation of Rule 404(b), "referred to possible homicides prior to the two for which [appellant] was standing trial," as the State had maintained the two teardrop tattoos symbolized the homicide of Courtney and Terrence. He further summarily argues evidence appellant was involved in two prior murders is inadmissible under Rule 403, SCRE, as it is "unduly prejudicial and inflammatory."

Rule 403, SCRE provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pursuant to Rule 404(b), SCRE provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The rule further provides, "It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent." *Id.*

The precise argument appellant raises on appeal, that the hash mark testimony referred to prior homicides and thus violated Rules 403 and 404(b), was not raised to the trial judge and therefore is not preserved for review. In his argument to the trial court, appellant asserted the State intended to bring out testimony that he received the *teardrop* tattoos while in prison, which was improper character propensity evidence. Appellant argued the State's gang expert testimony on the meaning of two teardrop tattoos should be excluded, asserting testimony from a corrections officer regarding when appellant received the tattoos would allow the State to impermissibly remark on appellant's prior criminal record.[14] On appeal,

---

13. Appellant argues generally about "[o]ne of these witnesses" and "[o]ne of these [tattoos]," and cites only to the testimony of Investigator O'Cain and O'Cain's reference to the hash marks on appellant's body.

14. The record shows the State sought to introduce evidence that appellant did not have the two teardrop tattoos on his face when he initially

appellant challenges the admission of the *hash mark* evidence, not that of the teardrops. Appellant never argued to the trial judge as he does on appeal that the hash mark brand referred to possible homicides prior to the two for which appellant was standing trial, thereby amounting to improper character propensity evidence that was unduly prejudicial and inflammatory. Further, there is nothing in the record to indicate the State asserted the hash marks referenced prior bad acts. The State did not present evidence as to when appellant obtained the hash marks, nor argue the hash marks were placed on his body to signify murders or bad acts committed in incidents unrelated to that for which appellant stood trial. Because this argument was neither raised to nor ruled upon by the trial judge, it is not properly preserved for our review. *See State v. McKnight*, 352 S.C. 635, 646–47, 576 S.E.2d 168, 174 (2003) (issue must be raised to and ruled upon by trial court to be preserved for review).

█ Further, even if we assumed appellant's objection to the teardrop tattoo evidence as improper character propensity evidence, along with his general objection to any tattoo evidence, is sufficient to preserve his assertion on appeal that the hash mark evidence improperly placed his character in evidence and was unduly prejudicial, we find any error in the admission of this evidence to be harmless. As noted, the record shows Pooh testified that appellant stated an intent to go over to T.S. Martin just after Pooh's run-in over there. Diego testified he agreed to accompany appellant to T.S. Martin to "handle something" and identified appellant as the one in the group who pointed a rifle at a house while all the others ran after the first shot, and later observed appellant

---

entered the Department of Corrections after the death of the two victims, but was subsequently found to have the tattoos during his time there, implying he received the tattoos while in the prison system, after the death of the victims. Appellant objected to this line of testimony, arguing it would unfairly remark on his prior criminal history, and proposed the State introduce the time line of the tattoos without referring to the Department of Corrections. As a result, appellant and the State thereafter entered into a stipulation that tattoos depicted in certain pictures of appellant's body were observed as of February 2, 2006, but were not present on appellant's body as of March 11, 2005.

dispose of the weapon. Shante testified she observed appellant running from the direction of T.S. Martin at full speed, she overheard appellant saying he had just left T.S. Martin, that he was "spraying" when he was shooting, that two little kids where shot, and that he had done this because earlier in the evening they had gotten into something with some Bloods. Also, Tyrone witnessed the shooting and identified appellant as the shooter.

Further, appellant admitted in his last statement to police that he was present at the shooting and he had in fact fired a weapon. Thus, there is substantial other evidence suggesting appellant's guilt. Additionally, appellant only points to the testimony of O'Cain regarding the hash mark evidence. It is clear Mahoney likewise testified the hash marks on appellant "could mean bodies," and the testimony of O'Cain would therefore be largely cumulative to that of Mahoney. *See State v. Page*, 378 S.C. 476, 483–84, 663 S.E.2d 357, 360 (Ct.App. 2008) (holding error is harmless where it could not reasonably have affected the trial's outcome; no definite rule of law governs the finding that an error was harmless; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case; in considering whether error is harmless, a case's particular facts must be considered along with various factors including: the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case). Accordingly, any error in the admission of the hash mark evidence would be harmless.

For the foregoing reasons, appellant's convictions are

AFFIRMED.

THOMAS and PIEPER, JJ., concur.